KENALL MANUFACTURING COMPANY, Petitioner, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents.

First District (3rd Division) No. 86—672

Opinion filed January 28, 1987.

696

Collins & James, of Hoffman Estates (Cary J. Collins, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Gabriel M. Rodriquez, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

Rick Allan White, of Chicago, for respondent Frank May.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, Kenall Manufacturing Company, appeals directly to this court from a decision of the Illinois Human Rights Commission (Commission) which held that Kenall discriminated against its employee, respondent Frank May, on the basis of his handicap. On appeal, Kenall contends that the Commission erred as a matter of law in finding that May was handicapped, that there was insufficient evidence to support the Commission's conclusions, that the Commission's decision was procedurally improper, that the Commission failed to provide Kenall with a meaningful opportunity to be heard on remand, and that the Commission erred in awarding attorney fees to May.

At a hearing before a Commission hearing officer, the parties stipulated that May began working at Kenall in August 1965 and that on January 30, 1980, he suffered a heart attack and began disability leave on February 1, 1980, at which time he was an assembly-line foreman. On August 1, 1980, May returned to work with a doctor's release, and he was terminated that same day. May subsequently filed a charge with the Department of Human Rights, which later filed a complaint of civil rights violation against Kenall under the Illinois Human Rights Act (Ill. Rev. Stat. 1985, ch. 68, par. 2—102(A)).

At the hearing, James Hawkins, Kenall's vice-president, testified that May had received a salary increase and bonus in January 1980, two weeks prior to May's heart attack. Hawkins believed the bonus

and raise were justified. Kenall had never received any complaints about May. Following the heart attack, May became the first employee to participate in Kenall's new disability plan.

In March 1980, Hawkins met with George Milatz, the production manager and May's supervisor, and Dennis Gackowski, the materials control manager, and it was tentatively decided to terminate May. May was not informed of that decision. On July 26, 1980, May informed Hawkins that the doctor would soon be releasing him to return to work. Hawkins arranged to meet with May the following week.

Hawkins instructed Milatz to terminate May on August 1, with the explanation that May had performed poorly with regard to employee relations, which manifested itself in labor relations problems which Kenall had experienced, and May's selection of a poorly qualified assistant, Blanca Fabian, who had been fired in July 1980. The week following May's termination, Hawkins himself repeated these two reasons to May. Hawkins' conclusion that May created employee relations problems was a result of his own observations and information from Carlos Restrepos, a labor relations consultant Kenall had retained. Restrepos was on the Kenall premises from February through June 1980.

Hawkins testified further that no document existed at Kenall which set forth the reasons for May's firing. Kenall's common practice prior to termination was to inform an employee of unsatisfactory work performance and provide him with the opportunity to improve. May, however, was never warned about poor performance. Hawkins denied that Kenall's decision to terminate May was influenced by the cost of carrying May on the disability plan or increase in employment insurance premiums. The daily activities of an assembly-line foreman did not require physical exertion and could be performed by a person with a history of heart disease.

Ken Hawkins, James' father and Kenall's chief executive officer, testified that May had been hospitalized several times during his employment with Kenall, causing it to institute a long-term disability plan. In the spring of 1980, the Hawkins discussed the possibility of terminating May.

Otis Whitbey, a machine operator, testified that in 1979, Kenall employees began to discuss a walk-out when promised Christmas bonuses were withheld. Employee unrest increased after Kenall failed to give promised wage increases and better insurance benefits. May had a good relationship and communicated well with Kenall employees. Problems with May were not the basis of the complaints the workers

had with management. Whitbey attended a meeting a few days after July 26, 1980. James Hawkins informed the employees at the meeting that May would not be returning to Kenall based on his doctor's recommendation. Basil and Ken Whitbey, Otis' sons and Kenall employees, testified similarly.

George Milatz testified that two weeks prior to May's heart attack, May informed Milatz that his assistant should be demoted as soon as a replacement could be found. Milatz subsequently made Fabian acting foreman of the assembly line while May was on disability leave. Milatz was responsible for her performance during May's absence. Milatz was instructed to fire May on August 1, but the only reason he gave May was that Milatz had found a new person who was better for the job. Although it was standard practice to give an employee a written statement describing the reasons for termination, Milatz did not document the reasons for May's termination until some time later, possibly at the request of counsel. Milatz believed May to be a loyal and trusted employee and thought an employee deserved to know about any claimed deficiency in his performance.

May testified that in January 1979, he recommended Fabian for promotion to assistant foreman because she appeared to be qualified. Milatz agreed, and promoted her. In January 1980, May informed Milatz of problems involving Fabian, and recommended that she be demoted. Milatz agreed, but waited until certain labor problems subsided. The labor problems centered on the issues of wage increases, insurance benefits, and Christmas bonuses. In March 1980, at the request of Kenall, May talked with employees on the assembly line in an attempt to dissuade them from unionizing.

In late July 1980, May was told by his doctor that he could return to work on August 1, and he so informed James Hawkins. On August 1, Milatz informed May that he was being fired because of the union problems and because of his choice of an assistant. May had never received any indication that his work was unsatisfactory prior to his termination on August 1. May expressed surprise to Bob Chism, a vice-president, but acknowledged that he had been ill several times over the last "couple" of years. Chism replied, "No, actually, it's three years, Frank." Chism later testified that he spoke to May on August 1, but had never discussed the reasons for his termination.

On February 19, 1983, the hearing officer issued a recommended order and decision including extensive findings of fact. These findings set forth that during May's employment he suffered several disabling ailments which required Kenall to adopt a long-term disability plan; that May's relationships with the employees he supervised were good;

that Kenall did not consider May's handicaps as adversely affecting his duties, but it did consider the cost of the disability to the company; and that May's replacement was paid $130 per week less than May had been earning, and never used the long-term disability plan. The hearing officer concluded that May was handicapped, had alleged a *prima facie* case, and that Kenall had discriminated against May on the basis of his handicap in violation of section 3a of the Fair Employment Practices Act (FEPA) (Ill. Rev. Stat. 1979, ch. 48, par. 851 *et seq.* (repealed)).

On October 21, 1983, the Human Rights Commission issued its order and decision, affirming the hearing officer's recommendation. The Commission found that the record supported those findings. The Commission stated that Kenall had failed to show how the hearing officer's application of the FEPA had prejudiced Kenall since the repealed section 3 of the FEPA and the currently effective section 2—102 of the Human Rights Act were at least coextensive. The Commission stayed the effect of its decision pending resolution of the issue of attorney fees. On December 27, 1983, the Commission remanded the cause for a redetermination of the reasonableness of the number of hours expended by the attorney. On November 29, 1984, the Commission issued its final order awarding $19,393.25 as reasonable attorney fees and lifted the stay.

On December 17, 1984, Kenall filed a complaint for administrative review, and the trial court reversed and remanded for readjudication of the case under the Human Rights Act and for a ruling on the issue of attorney fees. May filed a motion for clarification and reconsideration, seeking to determine whether by ordering "readjudication" the court meant that a hearing *de novo* before the hearing officer was required. On July 5, 1985, the trial court entered an order clarifying its previous remandment order, stating that the Commission was "to state in clear and simple language that the decision has been determined under the provisions of the Human Rights Act and to correct the error of the administrative law judge, and to rule on the attorney fees issue, not previously ruled upon." On remand, the Commission declared that the facts of the case gave rise to a cause of action under the Human Rights Act and that its previous decision was made pursuant to the provisions of the Human Rights Act. The Commission ruled that May was entitled to an additional $1,066.75 in attorney fees.

Kenall appealed to the circuit court and on January 14, 1986, the trial court again reversed and remanded because the Commission's decision did not contain findings of fact and conclusions of law. Instead, it merely pronounced that the hearing officer's decision was

sustained under the Human Rights Act. The trial court directed the Commission to make appropriate findings of fact and conclusions of law "and hold a new evidentiary hearing, if the Commission is unable to decide the case under the Human Rights Act using the findings of fact of the administrative law judge and applying them under the Human Rights Act."

On February 20, 1986, the Commission issued its order and decision. The Commission found that the hearing officer's findings of fact were not tainted by the fact that she erroneously applied the FEPA. The Commission then examined the findings and determined that they were not against the manifest weight of the evidence. It concluded that Kenall had violated the Human Rights Act. It affirmed the hearing officer's decision as modified by the Commission. Kenall appealed to the circuit court for the third time, and the trial court correctly ruled that review must proceed directly to the appellate court. See Supreme Court Rule 335 (103 Ill. 2d R. 335); section 8—111(A) of the Human Rights Act (Ill. Rev. Stat. 1985, ch. 68, par. 8—111(A)).

■ Discrimination actions under the Human Rights Act are analyzed under the three-step analysis set forth in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817. (*Village of Oak Lawn v. Illinois Human Rights Com.* (1985), 133 Ill. App. 3d 221, 478 N.E.2d 1115.) The employee has the burden of proving by a preponderance of the evidence a *prima facie* case of unlawful discrimination, which thereby creates a rebuttable presumption of discrimination. (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) The employer then has the burden of stating a legitimate, nondiscriminatory reason for its employment decision, which has the effect of successfully rebutting the presumption of unlawful discrimination. (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) The employee must then prove by a preponderance of the evidence that the legitimate reason offered by the employer was not the true reason underlying its employment decision and is instead only a pretext. This burden merges with the employee's ultimate burden of proving whether the employer unlawfully discriminated. *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089; *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817.

■ An employee may establish a *prima facie* case of unlawful discrimination either by direct or indirect evidence. (*K mart Corp. v. Illinois Human Rights Com.* (1984), 129 Ill. App. 3d 842, 473 N.E.2d

73.) The employee must show that he is handicapped within the meaning of the statute, that an adverse job action was taken against him related to his handicap, and that he is qualified in that his handicap is unrelated to his ability to work. (See Ill. Rev. Stat., 1980 Supp., ch. 68, pars. 1—103(I), 2—102(A).) Kenall argues that May cannot be considered "handicapped" as a matter of law because May was fully recovered from the heart attack and released for work by his doctor. May's physical condition was "merely a temporary or transitory ailment from which, by his own admission, he was fully recovered." Kenall compares the heart attack to a broken arm or the measles.

Kenall argues that May does not fall under the definition of "handicapped." On July 1, 1980, one month prior to Kenall's alleged discriminatory termination of May, the Illinois Human Rights Act became effective. Prior to that date, many handicap-discrimination suits were brought under the Equal Opportunities for the Handicapped Act (EOHA) (Ill. Rev. Stat. 1979, ch. 38, par. 65—21 *et seq.* (repealed).) This court held that section 2 of the EOHA did not adequately define "handicap." Consequently, Illinois courts fashioned a definition, requiring a person to be severely limited in performing major life functions. (*Lyons v. Heritage House Restaurants, Inc.* (1982), 89 Ill. 2d 163, 432 N.E.2d 270; *Advocates for the Handicapped v. Sears, Roebuck & Co.* (1978), 67 Ill. App. 3d 512, 385 N.E.2d 39, *cert. denied* (1979), 444 U.S. 981, 62 L. Ed. 2d 408, 100 S. Ct. 484.) Thus, an employee needed to show an actual, existing handicapped condition to make out a claim of handicap discrimination under the EOHA. It was insufficient to show only that the employer perceived the employee as being handicapped. (*Kirby v. Illinois Central Gulf R.R. Co.* (1983), 117 Ill. App. 3d 1070, 454 N.E.2d 816.) Under this type of analysis, Kenall argues that May would not qualify as handicapped because he cannot show an actual, existing handicapped condition exists since he is fully recovered from his heart attack. He could not show that his condition imposes a severe barrier on the performance of major life functions. Kenall's reliance on the definition of handicap set forth in these cases, however, is misplaced because these holdings are no longer the law in Illinois.

■ The Human Rights Act became effective on July 1, 1980, and it supersedes the EOHA and the FEPA. The Human Rights Act includes a definition of "handicap" which is much broader than the restrictive definition previously fashioned by the courts:

"  'Handicap' means a determinable physical or mental characteristic of a person, the history of such characteristic, or the perception of such characteristic by the person complained

against, which may result from disease, injury, congenital condition of birth or functional disorder and which characteristic *** is unrelated to the person's ability to perform the duties of a particular job or position." Ill. Rev. Stat., 1980 Supp., ch. 68, par. 1—103(I).

Under this definition, there are three ways that a person may fall under the definition of a handicap. Similar to the previous judicial definition under the EOHA, a person may suffer from an existing handicapped condition. The Human Rights Act, however, expands the condition to include a person who either has a history of such handicapped characteristics or who is perceived by the employer as having a handicap. (Ill. Rev. Stat., 1980 Supp., ch. 68, par. 1—103(I).) Following the rules of statutory construction, it may be presumed that when the legislature enacted this definition, it sought to change the previously used judicial definition. (See *Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund* (1983), 95 Ill. 2d 211, 447 N.E.2d 394.) In the present case, if the Commission could reasonably find that May had a history of a heart condition, or that Kenall perceived May as handicapped, the fact that May had fully recovered from his first heart attack would not preclude him, as a matter of law, from coming under the statutory definition of a handicapped person.

■ Kenall argues that the evidence was insufficient to support a *prima facie* case or the Commission's finding that May was perceived by Kenall as being handicapped. Under the Administrative Review Law, the findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct. (Ill. Rev. Stat. 1983, ch. 110, par. 3—110; Ill. Rev. Stat. 1983, ch. 68, par. 8—111(A)(1).) A reviewing court is limited to a determination of whether the agency's findings are against the manifest weight of the evidence. (Ill. Rev. Stat. 1983, ch. 68, par. 8—111(A)(2).) If the issues are merely ones of conflicting testimony or credibility of witnesses, the agency's findings should be upheld. *Keen v. Police Board* (1979), 73 Ill. App. 3d 65, 391 N.E.2d 190.

■ In the present case, May had a history of heart disease as evidenced by his heart attack and six months' disability leave of absence. May thus fell under the statutory definition of a handicapped person. May also fell under the statute's definition in a second way, by showing that Kenall perceived him as being handicapped. This was demonstrated by direct evidence when employees testified that they were told by Hawkins at a meeting that May could not return to work because of his doctor's orders. This announcement was made after May

told Hawkins that his doctor had released him for work. Kenall's perception of May as handicapped was also shown by indirect evidence. Two weeks before his heart attack, May was given a bonus and a raise, which James Hawkins believed May deserved. No employee complaints were received regarding May. Shortly after May's attack and request for leave, Kenall decided to terminate May. James Hawkins testified that a person with a history of heart disease could perform May's job. Thus, May had made out a *prima facie* case of handicap discrimination by showing he falls within the statutorily protected group, that his termination by Kenall was related to the handicap, and that the handicap was unrelated to his qualifications and ability to perform his job.

■ In the second step of analysis in a discrimination case, the employer must articulate a legitimate, nondiscriminatory reason for its action. (*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817.) Kenall met its burden when it stated that it fired May based upon his poor rapport with the employees whom he supervised and his poor choice in selecting an assistant.

■ In the third step of the analysis, the employee must show that the reasons articulated by the employer are pretextual. (*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817.) James Hawkins testified that May had poor relationships with his employees. The testimony of several employees, however, evidenced May's good relationships with the employees. Moreover, Kenall management never received complaints from employees about May. Furthermore, Kenall management telephoned May at home only one month after his heart attack and asked him to come in and talk to the workers about employee unrest and try to dissuade them from forming a union. Such action is contrary to James Hawkins' testimony that May could not communicate with the employees.

Evidence also demonstrated that the labor unrest was a result of Kenall's broken promises in regard to salaries and benefits. There was no evidence to show that the labor problems stemmed from May's relationship with the employees. James Hawkins' testimony that the labor consultant observed May's poor rapport with the workers is undermined by the fact that Restrepos never observed May working because May was on disability leave during the time period when Restrepos was on the Kenall premises. Moreover, Restrepos did not file any written reports indicating May had any communication problems.

In regard to May's choice of an assistant, the record shows that May's supervisor, Milatz, agreed to promote Fabian and make her an

assistant. Furthermore, a few weeks prior to his heart attack May recommended that Fabian be demoted, but Milatz decided to delay that action. During May's disability leave, Milatz was responsible for Fabian, and Milatz elevated Fabian to acting foreman.

Finally, the reasons for May's termination which James Hawkins gave at the hearing were contrary to the reason he gave the Kenall employees. Thus, the Commission's finding that Kenall's articulated reasons for firing May were pretextual is not against the manifest weight of the evidence. In addition, James Hawkins' testimony established that May's handicap is unrelated to the performance of his job. May successfully proved that Kenall violated the Human Rights Act by discrimination against May on the basis of his handicap.

■ Kenall next contends that the Commission's failure to remand the case for a new hearing before a hearing officer was procedurally improper. Under section 8—107 of the Human Rights Act, the hearing officer makes findings and issues a recommended order. The Commission reviews the record and may adopt the findings and recommendations of the hearing officer. (Ill. Rev. Stat. 1985, ch. 68, par. 8—107(E)(1).) The Commission is required to adopt the hearing officer's findings of fact if they are not contrary to the manifest weight of the evidence. (Ill. Rev. Stat. 1985, ch. 68, par. 8—107(E)(2).) The Commission properly followed this procedure. When the trial court remanded the case to the Commission for the second time, it ordered the Commission to hold a new evidentiary hearing only if the Commission was unable to decide the case under the Human Rights Act using the findings of fact of the hearing officer and applying those findings under the Human Rights Act. On remand, the Commission found that the factual findings of the hearing officer would not have differed if she had applied the Human Rights Act. The findings of fact were found to be merely factual determinations based upon the allegations in the complaint and the evidence presented and were not tied to any particular law. The Commission held that the hearing officer's findings of fact were not against the manifest weight of the evidence, and it adopted those findings. The Commission then presented a thorough analysis of the facts under the Human Rights Act. We find that the Commission complied with the trial court's order and that the Commission's actions were not procedurally improper.

■ Kenall also contends that it was denied a meaningful opportunity to be heard because it was not allowed to file written exceptions or argue the case on remand. Kenall had a full hearing before the hearing officer and the Commission. Kenall was permitted to file written exceptions to the original decision and argue its case before the

706

Commission. The case has been considered by the Commission three times, has been considered by the trial court twice, and is now before this court. Kenall has received full judicial review of the Commission's decision and has not been denied a meaningful opportunity to be heard.

▄▄▄ Kenall finally maintains that the Commission erred in awarding attorney fees to May because Kenall prevailed twice in the trial court. While section 8.01(a) of the FEPA provided for an award of attorney fees only if the person filing the charge prevailed in the circuit court, the Human Rights Act contains no equivalent restriction. Section 8—108(G) of the Human Rights Act permits the Commission to award attorney fees to the employee upon finding a civil rights violation. In the present case, the Commission found a violation, and we affirm that finding. The award of fees, then, must stand. We decline, however, to remand the case to the Commission for a determination of whether May is entitled to additional attorney fees. The fees awarded by the Commission are adequate.

For the foregoing reasons, the decision of the Human Rights Commission is affirmed, and the case is remanded for enforcement proceedings.

Affirmed.

WHITE and FREEMAN, JJ., concur.