AERO TESTING & BALANCING SYSTEMS, INC., Petitioner, v. THE HUMAN RIGHTS COMMISSION et at., Respondents.

First District (3rd Division)   No. 1—88—1353

Opinion filed June 28, 1989.

Seyfarth, Shaw, Fairweather & Geraldson, of Chicago (William R. Sullivan, Jr., and Joseph S. Turner, of counsel), for petitioner.

Maganzini, McMahon & McNicholas, of Chicago (Paul J. Maganzini, of counsel), for respondents.

JUSTICE McNAMARA* delivered the opinion of the court:

Petitioner, Aero Testing & Balancing Systems, Inc., a division of Climatemp, Inc., appeals from a decision of the Illinois Human Rights Commission (Commission) which held that Aero discriminated against its employee, Jack Pachowicz, on the basis of his handicap, multiple sclerosis. An administrative law judge (ALJ) found unlawful discrimination and recommended eight months' back pay and benefits, plus $39,095 of the requested $51,404 as attorney fees and costs. The Commission, with one dissenting member, adopted the ALJ's findings and recommendation.

Aero contends that the Commission's finding as to Pachowicz' job duties was against the manifest weight of the evidence; that the Commission's finding that Pachowicz' handicap was unrelated to his ability to perform his job was against the manifest weight of the evidence; that the attorney fees award was excessive; and that the ALJ committed prejudicial error in not permitting certain cross-examination.

In 1969, Pachowicz began working for Climatemp as a sheet metal apprentice. In 1979 or 1980, he was transferred to Aero as a testing and balancing technician, which involved performing evaluative tests and overall system balancing of commercial air conditioning systems. The physical requirements of the job include repeated climbing up a ladder, 50 to 100 times a day, to make adjustments in the system, climbing down the ladder to take and record the readings, and then climbing up the ladder again to make further adjustments. Sometimes one man stayed on the ladder making adjustments while a second man performed the other duties on the ground.

On May 10, 1982, Pachowicz was diagnosed as having multiple

---

*Justice McNamara participated in this appeal prior to his assignment to the sixth division.

sclerosis, a degenerative nerve disease. In Pachowicz' case, the disease primarily affected the function of his legs, causing some stiffness and unsteadiness.

From November 1982 to February 1983 Pachowicz was laid off. He was recalled in January 1983 to do "light work" or "paperwork." On May 20, 1983, Pachowicz was terminated. On November 21, 1983, Pachowicz filed a charge of discrimination with the Illinois Department of Human Rights (Department).

On August 16, 1984, a complaint issued from the Department. In July and August 1985, an eight-day hearing was held before an ALJ. On January 20, 1986, the ALJ issued an interim recommended order and decision finding that Pachowicz was a handicapped person. The ALJ found that Pachowicz established a *prima facie* case of handicap discrimination and that Aero failed to articulate a legitimate, nondiscriminatory reason for Pachowicz' termination. The ALJ held that Aero had a duty to prove the reasonable accommodation of continuing to assign Pachowicz to normal duties until February 1984, when he could no longer perform such duties. Because of the substantial deterioration of Pachowicz' condition after that date, Aero had no duty to reinstate Pachowicz to his prior position, and Pachowicz failed to prove that any other reasonable accommodation existed.

On March 31, 1988, the Commission issued a decision affirming the findings of the ALJ in all respects.

■ Initially we dispose of Pachowicz' claim that the appeal should be dismissed because Aero failed to include the name "Climatemp, Inc.," in the heading of this cause and Aero was not named as a separate legal entity but solely as a division of Climatemp. Aero simply adopted the exact heading used by the Commission in the order from which Aero appeals. No jurisdictional problem arises here.

■ Since the briefs were filed in the present case, another division of this court dismissed an appeal after finding that the employer had failed to appeal the three-member panel decision of the Commission to the full Commission. *Castaneda v. Illinois Human Rights Comm'n* (1988), 175 Ill. App. 3d 1085, 530 N.E.2d 1005.

We disagree with the *Castaneda* holding. The statute directs that application for rehearing shall be viewed with disfavor and only upon a clear demonstration that a matter raises legal issues of significant impact or that three-member panel decisions are in conflict. (Ill. Rev. Stat. 1987, ch. 68, par. 8—107(F).) Section 8—107(E)(1) of the Illinois Human Rights Act provides that final decisions will be issued through a panel of three members. We do not believe the exhaustion of administrative remedies requires application for rehearing before

the entire Commission prior to appeal to this court. (See *Jackson Park Yacht Club v. Department of Local Government Affairs* (1981), 93 Ill. App. 3d 542, 417 N.E.2d 1039.) The appeal is properly before us.

Aero challenges the Commission's decision, which adopted the findings of the ALJ, as being against the manifest weight of the evidence.

■ The findings and conclusions of the Commission on questions of fact shall be held to be *prima facie* true and correct. (Ill. Rev. Stat. 1983, ch. 110, par. 3—110.) A reviewing court must sustain the Commission's findings of fact unless they are against the manifest weight of the evidence. (Ill. Rev. Stat. 1987, ch. 68, par. 8—111(A)(2).) If the issues are merely ones of conflicting testimony or the credibility of witnesses, the Commission's findings will be upheld. *Kenall Manufacturing Co. v. Human Rights Comm'n* (1987), 152 Ill. App. 3d 695, 504 N.E.2d 805.

■ Discrimination actions are analyzed under the three-step analysis announced in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817. (See *Village of Oak Lawn v. Illinois Human Rights Comm'n* (1985), 133 Ill. App. 3d 221, 478 N.E.2d 1115.) First, the employee must prove by a preponderance of the evidence a *prima facie* case of unlawful discrimination, which thereby creates a rebuttable presumption of discrimination. The employer then bears the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment decision; and the employee must then prove that the reason offered is only a pretext. *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089; *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817.

Where the facts of a particular case, however, render the formula awkward or inapplicable, it should be discarded. (*Board of Trustees v. Human Rights Comm'n* (1985), 138 Ill. App. 3d 71, 485 N.E.2d 33.) All parties here agree that the true dispositive question is whether Pachowicz proved his physical condition was unrelated to his ability to perform his job.

The evidence supported the ALJ's finding that, while Aero's "announced reason for the termination was ambiguous and difficult to identify," when stripped of the abstractions, the testimony "amounted to an admission that [Pachowicz'] 'MS' was the actual reason." Aero has stated both that the termination was due to "no work," and that it was due to Pachowicz' inability to perform his job as a result of his handicap. No one else was laid off in May 1983, but

two men changed to different positions. Ronald Metz, a manager at Aero and Pachowicz' supervisor, first testified that business was bad at the end of 1982. "If there's no work, you don't work." However, Metz then testified that there was no work left that Aero believed Pachowicz was physically able to perform. He admitted that there was work for Pachowicz if he were able.

Aero, however, maintains that notwithstanding this admission, Pachowicz failed to prove his handicap was unrelated to the job duties, in which case the articulated reason could be reasonable and legitimate.

■ A *prima facie* case of unlawful discrimination requires a showing that the employee is handicapped within the meaning of section 1—103(I) of the Illinois Human Rights Act. (Ill. Rev. Stat. 1983, ch. 68, par. 1—103(I).) The employee must be a member of a protected group. (Ill. Rev. Stat. 1983, ch. 68, par. 1—103(I).) Aero does not challenge the Commission's finding that the diagnosis of multiple sclerosis placed Pachowicz within such a group.

This is not enough, however. The statutory definition of "handicap" requires a showing that the employee is qualified in that his handicap is *unrelated* to his ability to perform his job. Ill. Rev. Stat. 1983, ch. 68, par. 1—103(I); *Kenall Manufacturing Co. v. Human Rights Comm'n* (1987), 152 Ill. App. 3d 695, 504 N.E.2d 805; *Sanders v. United Parcel Service* (1986), 142 Ill. App. 3d 362, 491 N.E.2d 1314.

The most significant testimony on this issue was offered by Pachowicz' treating physician, Dr. Jordon L. Topel, a neurologist. He opined that as of the final layoff date of May 1983, Pachowicz was physically capable of performing his job duties, including "doing walking, standing, sitting, writing and at times climbing ladders." No accommodations were needed from his employer. Dr. Topel never instructed Pachowicz to discontinue or curtail his employment activities. He certainly would have done so if he believed it was necessary for safety reasons.

Dr. Topel regularly discussed work duties with his patients. If there were any major questions, he would speak with the employer in order to dispel misconceptions about the disease. Dr. Topel discussed job duties with Pachowicz and "the major problem *** was mainly standing for periods on the ladder, unsteadiness of that." Pachowicz reported that "he frequently worked with another man" and the "other person would do a lot of the climbing up the ladder." Other than that, there were no other limitations in regard to his work.

Dr. Topel's testimony was supported by his medical examinations and notes throughout the relevant period, indicating that the symptoms varied little and the main problem was some lower leg stiffness. A February 1984 hospital discharge summary reciting the two-year history of the disease and a January 1985 rehabilitation evaluation clinic report corroborated that the symptoms remained minimal and varied little until early 1984.

On November 16, 1982, Dr. Topel noted that Pachowicz' legs would become stiff, not when he was standing on ladders, but when he sat. At the end of 1982 or beginning of 1983, Dr. Topel "thought that his walking was getting somewhat worse" because the stiffness was worse. Pachowicz then responded well to an alteration in his medication.

Just prior to the final layoff, Dr. Topel examined Pachowicz on May 4, 1983. Again he reported leg stiffness if Pachowicz sat. Dr. Topel wrote "work okay" and "just tightness both legs." Pachowicz informed him on May 25, 1983, that he was laid off and "thinks related to his illness." A June 1, 1983, note reports "legs not as tight." A June 19, 1983, note says, "very stiff legs." On September 21, 1983, Dr. Topel wrote, "tired, legs swelling," and noted some shaking when he sat, but not when he was standing. Since February 1984, there has been a major deterioration in Pachowicz' condition. By May 1984, he was no longer able to stand unaided.

Aero argues that Dr. Topel was not familiar with the duties of a balancer and tester. We believe that the Commission could properly find the physician was sufficiently familiar with the physical requirements of the duties to render an informed opinion.

Aero also points to the testimony of its expert witness, Dr. Donald Harter, who opined that Pachowicz could not perform the duties of a testing and balancing technician. Dr. Harter, however, never examined Pachowicz. In addition, his opinion was given in response to a hypothetical question assuming job duties far beyond those Pachowicz was ever required to perform. The Commission could properly assign little weight to Dr. Harter's opinion.

Furthermore, the Commission was entitled to believe Pachowicz' competent testimony describing his actual job duties, and the fact that neither Pachowicz' supervisors nor co-workers ever complained of the quality of his work.

Pachowicz testified that he had no difficulty performing his job prior to his layoff. He never refused to perform any task. He never asked for a change in his job duties or for any accommodations. He never missed a day of work. Pachowicz was able to use ladders,

move and install equipment, and carry out any assigned duties. Pachowicz was not aware of the other men "helping" him by doing extra ladder work.

Pachowicz described the effects of the MS. His lower legs were tight and sometimes one leg would drag. Sometimes he would lean when walking and would touch a wall for balance. His legs never gave out, nor did he lose control of his leg muscles. He felt no worse at the time he was terminated in May 1983 than he did in May 1982, when his condition was diagnosed. He did not have to rest more often, did not ask for breaks, and did not voluntarily take breaks. If his knees hurt after kneeling a long time, for example, he would simply squat instead of kneel. Overall, he continued to perform his work, despite some tightness in his legs.

When Pachowicz was assigned to work with another man, he tried to keep the ladder climbing to a minimum. He would do most of the readings on the ground while the other man stayed on the ladder and made the adjustments. But in the summer of 1982, he did the ladder work at the Ritz Carlton job while working with a co-worker who did not know how to make adjustments. At the Continental Bank job, he installed outlets by himself, requiring use of the ladder and going into the ceiling. At his last job, which was at One South Wacker and ran until his final layoff in May 1983, he was using ladders occasionally.

Pachowicz' supervisors and co-workers offered corroboration for his testimony. Aero's answers to interrogatories described Pachowicz' duties from 1980 until April/May 1983 as those of an adjusting and balancing technician without including any limitations. Metz testified that the accuracy of Pachowicz' work was never questioned. John Vitkovic, a testing and balancing technician at Aero, said there were never any problems with accuracy or quality at the One South Wacker job. Pachowicz always did what he was told. It was possible he did some of the installations alone.

Thomas DiGiovanni, a testing and balancing technician at Aero, testified that Pachowicz climbed ladders at the Presidential Plaza job in September and October of 1982. Pachowicz performed normal testing and balancing duties. He worked all day and came and left the job on his own. He never refused to do anything and never asked for a break.

Gus Verri, a testing and balancing technician at Aero, testified that Pachowicz climbed ladders at the Continental Bank job. Pachowicz might have installed the six missing dampers at the Water Tower Ritz Carlton in late October or November 1982. They worked

together testing transformers and performing other normal duties. The quality and accuracy of his work, including his readings and reports, were great. He did everything he was asked to do.

Robert Clifford, a testing and balancing technician at Aero, testified that at One South Wacker in October 1982, Pachowicz never asked for favors or left early. He always worked all day. There were never any problems with the quality of his work.

Pachowicz' brother testified that Pachowicz was doing ladder work at home, installing a garage door opener and hanging wallpaper, as late as 1984.

In addition, after leaving Aero, in October 1983 Pachowicz began working for Graphic Associates. He delivered packages throughout the Chicago area. Sixty percent to eighty percent of his time was spent making deliveries by car. The remaining time he made chromalin proofs while standing.

The evidence amply supports the Commission's finding that Pachowicz performed normal job duties between 1980 and May 1983. We agree with the ALJ that the record clearly shows that although Pachowicz "found it more physically taxing to perform his job, he continued to perform all required job functions without accommodation and without any absences from work."

Here, Aero never requested any medical report or records from Dr. Topel or Pachowicz. John Comforte, an Aero officer who terminated Pachowicz, admitted no knowledge of MS. Metz reported that he may have read an article about MS in Reader's Digest. This factor is particularly important where Pachowicz' supervisors never witnessed him having any problems at a jobsite while performing as a technician.

Comforte reports one telephone conversation with Dr. Topel in June 1982. When asked why an interrogatory answer stated they discussed whether Pachowicz could return to work when he had not yet been laid off, Comforte testified that the answer must be wrong, but then said the answer was not incorrect. Dr. Topel's notes, however, indicate the conversation occurred after the November 1982 layoff had already taken place. Pachowicz had asked Dr. Topel to contact Aero. According to Dr. Topel, the conversation lasted just a few minutes and only "very superficially" touched on the nature of Pachowicz' MS.

Contrary to Dr. Topel's medical records and testimony, Aero's interrogatory answer states Dr. Topel reported the Pachowicz' "strength was weakening and that [he] was having difficulty walking and maintaining balance." Incredibly, although totally denied by Dr.

Topel, Aero goes on to maintain:

> "Dr. Topel was asked if he would release [Pachowicz] to go back to work. Dr. Topel responded that he did not know whether [he] could go back to work."

Similarly, Comforte testified, "I asked if Jack could continue to work and [Dr. Topel] did not know."

Dr. Topel's testimony highlighted another striking contradiction affecting the credibility of Aero's defense. Dr. Topel testified that Comforte assured him the reason for the layoff after November 1982 was lack of work. In their testimony, Comforte and Metz admitted lack of work was not the reason for the November layoff.

Comforte testified he told Pachowicz and his wife that the November layoff was because "all of his coworkers were very concerned about his safety on the job site; that he was physically incapable of doing his job; that we were carrying Jack; and that he was doing perfunctory tasks."

Metz vacillated about the November layoff. He first said it was because of no work. Metz then contradicted himself and admitted the layoff was a result of the MS and the handicap was definitely a factor.

Thus, while the November layoff is not at issue here, testimony regarding that layoff indicates both the serious credibility problem permeating the Aero defense and the underlying misperception about the relationship between MS and Pachowicz' ability to perform his job duties. (We note that Pachowicz does not challenge the Commission's refusal to award lost wages between the date of his November 1982 layoff and recall in January 1983, as even if the first layoff was the result of unlawful discrimination, the claim is outside the scope of the complaint and was not before the Commission.)

Aero argues further that Pachowicz was not performing the actual duties of a tester and balancer. It introduced videotapes of claimed actual duties, including "pressure testing." Pachowicz, however, never performed that function. Clifford testified that Pachowicz never had a chance to learn it and that it was only a small percentage of the job. Metz testified that during the time Pachowicz was at Aero, there were very few pressure jobs.

In regard to the need to crawl into duct work shown in the videotape, several employees testified that it was done only "in times of trouble." Pachowicz testified he never worked in ducts during his entire employment with Aero.

The videotapes also showed men dangerously working near open walls and crawling over fences near open shafts or walking on open

beams. Metz admitted, however, that most of the buildings Pachowicz worked at were drastically different and that the tapes depicted OSHA safety violations. Metz testified he never saw Pachowicz on that type of "open construction site."

Aero maintains that Pachowicz functioned in the job until May 1983 only because it did not permit him to attempt to perform the duties required of the other men. The testimony clearly shows this is a classic case of the employer benevolently "protecting" the employee from his own handicap. Handicap discrimination rarely results from a hostile purpose or intent to discriminate, and often occurs under the guise of extending a helping hand or a mistaken, restrictive belief as to the limitations of handicapped persons. (*Pushkin v. Regents of University of Colorado* (10th Cir. 1981), 658 F.2d 1372, 1385 (multiple sclerosis), cited in *Carter v. Casa Central* (7th Cir. 1988), 849 F.2d 1048, 1056 n.8 (multiple sclerosis).) The testimony consistently shows, throughout the thousands of pages of transcript, that Aero guided its employees into a well-intentioned but misplaced plan of quietly protecting Pachowicz from the company's own perception of the disabling effects of MS, which had little or nothing to do with the actual handicap from which Pachowicz suffered.

The evidence reveals only that two or three times during 1982 and 1983 did an employee see Pachowicz stumble or fall while walking on a normal floor, without injury and without seeming at all bothered by the mishap. Several employees noticed the degree of tremor Pachowicz occasionally experienced in his legs. Nothing else was ever observed. The co-workers merely expressed concern for Pachowicz' safety and well-being, wondering if someone with MS should be on ladders. They never offered criticism of Pachowicz or concern that the safety of others was threatened in any way.

Significantly, the "protect Pachowicz from himself" policy prevented Aero from letting Pachowicz perform duties which he and his physician have clearly shown he was capable of performing. Pachowicz never complained, Metz testified, because they "watched" him "before he could ever complain." Metz instructed any concerned co-workers "to watch him and see what's going on. Don't leave him alone for fear he would get hurt." "Watching" meant that the "men would not let him do things they thought would be too dangerous for him." Metz testified that even the "shop boys would have concern about him, and he'd walk [through the shop]—and there's some sharp objects in the shop. He could be hurt."

Incredibly, Metz also testified that they kept Pachowicz with another man "because he was starting to falter." *prior* to having symp-

toms or diagnosis of MS. The faltering was caused by "his inexperience," which was normal. Later, he added that Pachowicz did not work alone either because of inexperience or because the other employees were concerned about Pachowicz' safety.

The ALJ correctly noted that Aero's reliance on the hearsay comments of several occasional co-workers, with no direct observation of his work, raises "a strong inference that the termination was a prejudiced reaction to the fact of 'MS'—precisely the type of discrimination at which the Act is directed." Furthermore, it was significant that none of the "co-workers upon whom [Aero] exclusively relied could identify any situation or task at which [Pachowicz] failed to adequately perform." Their comments about his leg tremors were conclusory. They "felt" someone with MS "should not perform the job because it was too demanding for someone with that affliction." However, preferences of co-workers are impermissible considerations under section 2(d) of the Commission's Interpretive Rules on Handicap Discrimination. 56 Ill. Admin. Code §2500.10 *et seq.* (1985).

As an alternative basis for a finding in favor of Pachowicz, the Commission found it was an obvious accommodation to continue letting Pachowicz work on two-man jobs, thus letting him perform the essential duties of the job. Section 4(d) of the Commission's Interpretive Rules on Handicap Discrimination (56 Ill. Admin. Code §2500.10 *et seq.* (1985)) acknowledges the concept of an accommodation that is "obvious in the circumstances."

Aero strenuously argues that Pachowicz could perform as a tester and balancer only if he worked on a two-man team, with the other man doing the ladder work. As the ALJ stated, this hotly disputed issue was of some significance because if the men generally worked in teams, Pachowicz' handicap was less of a factor because his partner could do some of the ladder work. Moreover, this issue highlighted the numerous inconsistencies permeating Aero's defense.

Several employees testified they worked alone 80% or 90% of the time. The Commission could properly find from the evidence, however, that although Aero preferred to assign just one man to a job, it was not uncommon for two technicians to work in teams. Pachowicz testified that most of the buildings on which he worked was done in teams. One man adjusted on the ladder while the other man read the outlet.

DiGiovanni stated he worked alone 90% of the time. However, when cross-examined about all the projects he worked on in a year's time, it proved to be a mathematical impossibility. DiGiovanni agreed that working in a team could make the job go faster.

Metz testified it was not economical to work in teams. He also testified, however, that he would not be surprised if Christie, an Aero supervisor who taught at the testing and balancing school, recommended using two people for gauge reading.

Metz first stated that the instances where men would work in a team were few. Metz and other employees testified, however, to a variety of reasons why the company would use teams. Moreover, a beginner works with someone for one to two years after going to testing and balancing school. They "switch him around" to learn different systems and methods. Pachowicz had gone to school in 1981. Metz testified that Pachowicz was "still floating around to get experience" in 1982 and early 1983.

Metz finally concluded that, well, "[e]ach job is an individual case and you have to approach it that way, and it is my decision to make." Actually, all that was needed to set up a team was for one worker to telephone and say he needed someone. Metz would tell him which co-worker to call. The ALJ properly pointed out that the distinction between whether men at the same site worked alone or in teams became blurred when Metz insisted that it was totally up to the men to allocate the work. In fact, the record shows that from January 1982 through May 1983, nearly every job Pachowicz worked on had at least one, and often several, teams working on the site.

This evidence tends to indicate that there was flexibility built into the job of tester and balancer. Metz and other employees testified repeatedly that each technician works differently and that there were many ways to complete the job properly. Metz did not control the method of work used at the site. "The men are responsible for their own jobs. They perform whatever function is necessary."

Our review of the record indicates the ALJ correctly summarized the significance of this issue:

> "The entire 'two-man team' controversy, while illuminative of [Aero's] willingness to bend the truth, was a significant but not critical issue. [Pachowicz] never refused to work alone. Metz at one point flatly pronounced that [Pachowicz] had *never* worked alone. He held this position despite being cross-examined with documents showing [Pachowicz] worked alone, dismissing them as inaccurate. Finally, he agreed that [Pachowicz] had worked alone on at least the 'I.C. Condo' project. [Pachowicz] established that he could and did work alone. At any rate, it is clear that enough two-man projects existed to assign [Pachowicz] generally to two-man teams, if it deemed this necessary."

As further evidence that Pachowicz was incapable of performing the job, Comforte and Metz testified that during the six weeks prior to his termination, Pachowicz was in such bad shape that they kept him working in Metz' office organizing the file cabinets. Metz then retreated from that position. It was possible that one day Pachowicz went into the field to help other testers. Maybe even more than 10 times. In fact, it could be Pachowicz was in the office just one week. Aero was unable to produce the timesheets for April, May and June 1983, as they were missing. Pachowicz testified that he worked in the office for just three or four days.

In an astounding demonstration of the incredibility of much of the Aero defense, Metz emphasized the vital importance of the accuracy of test reports and other documents, then did a complete reversal when documents were not in Aero's favor.

When records showed Pachowicz worked alone, or other men worked in teams, Metz stated that records do not always show who worked on a job. Documents showing only Pachowicz' initials did not mean Pachowicz did the testing and balancing work. Dates and names on test reports are "sometimes inaccurate. They have no meaning." Moreover, even if the timesheet showed Pachowicz was working on a certain job, that "doesn't mean that's the job he was on." While Metz insisted Pachowicz was only to do paperwork when recalled in January, he could not explain timesheets showing he did 25% paperwork, and 75% testing and balancing. There were no documents to show on which jobs Pachowicz worked alone, or how many one-man jobs they had going at the time.

The ALJ properly found that when Pachowicz tried to use documents to show he performed all required duties and that the men often worked in teams, the ALJ uncovered Aero's "stunning contradictions." Moreover, the ALJ correctly reasoned that if a technician worked alone 90% of the time and filled out his own reports, as Aero argued, 90% of the documents should be accurate as to who was assigned to the project.

■ We hold that the evidence supported the Commission's finding that Pachowicz proved he was terminated on the basis of his handicap and that his handicap was unrelated to his job duties. We believe this evidence supports the ALJ's reasoning and conclusions which the Commission adopted: "If an employer were going to terminate an employee based totally upon reports of co-workers, it is likely that it would engage in a somewhat detailed and exhaustive investigation. Yet the reports of the co-workers here were in the form of brief and sketchy comments. *** [I]t is highly suspect that it

would base a major decision as termination upon what amounted to a small number of rumors from people with limited opportunity to fully assess [Pachowicz'] capabilities."

Aero also points to testimony regarding an alleged offer by Aero that Pachowicz would be reimbursed and offered a drafting job if he would go to drafting school. However, we find it unnecessary to explore this particular accommodation. The Commission found it doubtful that such an offer was made. Because we find the evidence supports the Commission's finding that the handicap was unrelated to the ability to perform the job duties, and demonstrates the obvious accommodation of continuing to assign him to team work, it is unnecessary to determine whether this accommodation was required and, if so, whether it was offered.

■ Aero argues that the ALJ improperly reversed the burden of proof by requiring Aero to prove the job included duties it identified, and not merely those performed by Pachowicz. It maintains the "difference is critical" because Pachowicz never had to rebut Aero's legitimate articulated business reason for termination, *i.e.*, that he could not perform the essential duties. First, the burden of proof was not reversed. The ALJ simply believed Pachowicz and found much of Aero's evidence worthy of little or no weight.

Moreover, Aero failed to ever articulate a legitimate reason for terminating Pachowicz. Having failed to convince us that the evidence does not support a finding that Pachowicz set forth a *prima facie* case of handicap discrimination, and having failed to articulate a legitimate reason for terminating a man with a handicap unrelated to his job duties, we need go no further in the *McDonnell Douglas* analysis. See *City of Belleville, Board of Police & Fire Commissioners v. Human Rights Comm'n* (1988), 167 Ill. App. 3d 834, 522 N.E.2d 268.

■ Aero next contends that ALJ's refusal to permit additional cross-examination of Pachowicz after the ALJ asked several questions was prejudicial error. We agree with the Commission that those questions were on a collateral matter and, even if error occurred, it was not prejudicial.

■ Aero next contends that the attorney fees award was excessive and erroneous. We will not disturb the award because we find no abuse of discretion. (See *Rackow v. Illinois Human Rights Comm'n* (1987), 152 Ill. App. 3d 1046, 504 N.E.2d 1344.) The ALJ wrote a 26-page decision on this issue, and the Commission adopted that decision. The ALJ detailed the precise adjustments and reductions which he made. We summarize those details here.

Over 300 hours were expended by paralegals at $45 per hour. This was reduced to $25 per hour because of the nonlegal nature of their work and lack of information about their background and experience. The hours were reduced by 25% to 250.12 due to billing for services on nonprevailing issues and services of a nonlegal nature.

Over 350 hours were expended by Pachowicz' attorney at $100 per hour, and his associate at $50 per hour. The hours were reduced by 15% to 313.57 due to billings for services upon nonprevailing issues. The percentage reduction of hours for excessive or nonessential billings is a method which has been approved as an alternative to an item-by-item deduction. See, *e.g.*, *Copeland v. Marshall* (D.C. Cir. 1980), 641 F.2d 880; *Northcross v. Board of Education of Memphis City Schools* (6th Cir. 1979), 611 F.2d 636.

The ALJ specifically found that in this unusually complex matter, Pachowicz' counsel was "exceptionally well-prepared and tried the case with an uncommonly comprehensive command of information" and it was "evident that an extraordinary amount of preparation preceded the hearing." The ALJ declined, however, to make an upward adjustment of fees of an additional $75 per hour for 345.05 attorney hours, notwithstanding the complexity of the case, because of the fee award's disproportionality to the relief obtained. *Cf. Blum v. Stenson* (1984), 465 U.S. 866, 79 L. Ed. 2d 891, 104 S. Ct. 154 (approved upward adjustment for "exceptional success").

Aero insists that Pachowicz must separate billings for prevailing and nonprevailing issues because the Commission denied Pachowicz' original requests for additional back pay and reinstatement. We find it was often impossible to differentiate between hours expended in pursuit of issues upon which he prevailed and those upon which he was unsuccessful. There was little distinction between the prevailing and nonprevailing issues. (See *Hensley v. Eckerhart* (1983), 461 U.S. 424, 76 L.Ed. 2d 40, 103 S. Ct. 1933.) Were we to approve a reduction of fees for every item of relief a complainant requests, even where little time was spent on the issue, we would severely limit the relief a complainant would be willing to risk listing in the original complaint. See *Brewington v. Illinois Department of Corrections* (1987), 161 Ill. App. 3d 54, 513 N.E.2d 1056 (affirmed award for fees of $12,669 even where no reinstatement or back pay awarded); see also *Northtown Ford v. Human Rights Comm'n* (1988), 171 Ill. App. 3d 479, 505 N.E.2d 1215.

Aero points to the discrepancy between the compensatory award and attorney fees award. The estimated monetary relief recovered by Pachowicz is $14,331.78, obviously well exceeded by the $39,095.54

award of fees and costs for the eight-day hearing. This factor is not decisive. See, *e.g.*, *Rackow v. Illinois Human Rights Comm'n* (1987), 152 Ill. App. 3d 1046, 504 N.E.2d 1344 (affirmed award of $4,644 as reasonable attorney fees on a compensatory damage award of $300); see also *Kenall Manufacturing Co. v. Human Rights Comm'n* (1987), 152 Ill. App. 3d 695, 504 N.E.2d 805 (affirmed award for attorney fees of $19,393); *Loyola University v. Human Rights Comm'n* (1986), 149 Ill. App. 3d 8, 500 N.E.2d 639 (affirmed $17,722 award for two-day hearing due to extraordinary amount of preparation and complexity of case which was vigorously defended).

We conclude that the attorney fees award was appropriate, and it will not be disturbed. We also agree that the costs of $699.04 and Dr. Topel's $1,800 expert witness fee were reasonable, particularly in view of the importance of his testimony to a resolution of the case. We agree with the ALJ that the complexity of the case, Aero's vigorous defense, the extensive preparation and discovery, and the lengthy hearing support the award. Moreover, although Pachowicz did not get the requested additional several months of back pay and reinstatement, he prevailed upon the basic theory of his case—handicap discrimination.

Finally, pursuant to Pachowicz' request, we remand the case to the Commission for a determination of whether he is entitled to additional attorney fees. See *Kenall Manufacturing Co. v. Human Rights Comm'n* (1987), 152 Ill. App. 3d 695, 504 N.E.2d 805; *Johnson v. Human Rights Comm'n* (1988), 173 Ill. App. 3d 564, 527 N.E.2d 883.

For the foregoing reasons, the decision of the Human Rights Commission is affirmed, and the case is remanded for a determination of whether Pachowicz is entitled to additional attorney fees and for enforcement proceedings.

Affirmed.

FREEMAN, P.J., and RIZZI, J., concur.