JAMES J. HABINKA, Petitioner, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents.

First District (5th Division) No. 1—87—2321

Opinion filed December 15, 1989.

344

Douglas C. Nohlgren and Patricia M. Logue, both of Jenner & Block,

and Chicago Lawyers' Committee for Civil Rights Under Law, both of Chicago (Roy Petty, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, of Springfield, for respondent Human Rights Commission.

Pope, Ballard, Shepard & Fowle, Ltd., of Chicago (Carol B. Manzoni and Richard J. Brodecki, of counsel), for respondent Lake River Corporation, Terminals Division.

JUSTICE COCCIA delivered the opinion of the court:

Petitioner, James J. Habinka, appeals directly to this court from a decision of the Illinois Human Rights Commission (Commission) which held that petitioner failed to prove that he had been discriminated against by respondent, Lake River Corporation, Terminals Division (Lake River), on the basis of a legally cognizable physical handicap. Issues presented for review are: (1) whether the decision of the Commission that Habinka was not handicapped within the meaning of the Illinois Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 1—101 et seq.) (the Act) was against the manifest weight of the evidence; (2) whether petitioner's heroin/methadone dependency constituted an actual handicap under the relevant provisions of the Act; (3) whether petitioner's heroin/methadone dependency, known to his employer, constituted a perceived handicap under the relevant provisions of the Act; (4) whether the evidence supports a finding that Habinka's drug dependency was related to his ability to perform his job; and (5) whether the evidence supports a finding that Lake River placed Habinka on an unpaid leave of absence and later terminated his employment for legitimate, nondiscriminatory reasons which he failed to prove were pretextual.

On November 20, 1982, Habinka filed a charge with the Illinois Department of Human Rights (Department) against Lake River, his former employer, alleging that Lake River had discriminated against him on the basis of a physical handicap, drug dependency. The charge further alleged that Lake River had placed him on a personal leave of absence approximately two weeks after learning that he was in a methadone maintenance treatment program, informing him that he could not return to work until he was "off [m]ethadone," although, as Habinka stated, "the fact that I was on the [methadone maintenance] program did not affect my ability to perform the job." On March 12, 1984, the Department, pursuant to its authority under the Human Rights Act, filed a complaint against Lake River with the

Commission. The complaint alleged, *inter alia*, (1) "that Complainant is a physically handicapped individual in that Respondent regarded him as such because [he] is enrolled in a methadone maintenance treatment program"; (2) "that Complainant's doctors informed Respondent's officials that [his] participation in the *** program would not affect Complainant's ability to perform his job duties"; (3) "that on or about July 13, 1982, Respondent presented [him] with the option of accepting a forced personal leave of absence or being discharged"; (4) "that *** Respondent's Vice President of Operations, Rodney Foster, informed [him] that [Lake River] could not have a supervisor who was on methadone"; and (5) "that Respondent discriminated against Complainant by forcing [him] to accept a leave of absence due to his physical handicap which was unrelated to his ability to perform his job duties in violation of Section 2—102 (A) of the Human Rights Act." The complaint requested an order providing that Lake River reinstate Habinka to his former position at a rate of pay comparable to what he would have been receiving if the violation had not occurred, pay him lost wages, grant all accrued benefits and seniority status, and pay his attorney fees and costs. A hearing before Patricia A. Patton, the Commission's chief administrative law judge, was scheduled for June 11, 1984.

Prior to the hearing, Lake River filed a motion to dismiss the complaint on grounds that it failed to state a cause of action because the condition complained of by Habinka, namely, participation in a methadone maintenance program, "does not constitute a handicap within the meaning of the Illinois Human Rights Act." On July 12, 1984, the chief administrative law judge granted Lake River's motion, stating that the allegation that complainant is in a methadone treatment program did not set forth a "determinable physical or mental characteristic of a person," as required by section 1—103(I)(1) of the Human Rights Act. (Ill. Rev. Stat. 1981, ch. 68, par. 1—103(I)(1)), the section of the Act which defines "handicap." The order further stated that Lake River's alleged perception of Habinka's participation in a methadone program also did not suffice to meet the definition of a handicap as set forth in the Act, because "the definition of handicap is the same whether or not it is alleged to be perceived." Complainant was granted leave to file an amended complaint.

On August 17, 1984, Habinka filed his amended complaint, alleging, *inter alia*, that (1) "[he] has a history of physical dependence on opiates"; (2) "opiate dependency is a determinable mental or physical characteristic resulting from a disease or functional disorder"; (3)

"the most appropriate treatment for [his] condition \*\*\* includes the use of regular doses of the prescription drug methadone under the supervision of a licensed physician"; (4) "[he] is currently and at all times relevant to this case has been undergoing treatment for his \*\*\* opiate dependency \*\*\* under the supervision of a licensed physician [which] includes [m]ethadone"; (5) "as a result of the treatment program, [he] has become physically dependent on \*\*\* [m]ethadone"; (6) "[his] physical dependence on [m]ethadone is a determinable mental or physical characteristic resulting from a disease or functional disorder"; (7) "[Lake River] perceives [him] to be physically drug dependent and handicapped because [he] is a participant in a [m]ethadone treatment program"; and (8) "[he] is handicapped within the meaning of the Illinois Human Rights Act \*\*\* either in [sic] virtue of [his opiate dependency] or [his methadone dependency] or because of [Lake River's] perception of his condition of [drug dependency and methadone program participation]."

Following discovery, a four-day hearing on the matter was held before administrative law judge (ALJ) Richard J. Gonzalez. Both parties presented the testimony of lay and expert witnesses, and Habinka's medical records and other documents were submitted into evidence. At the conclusion of this proceeding, ALJ Gonzalez issued an interim recommended order and decision which concluded that the evidence presented by the parties sustained Habinka's complaint of handicap discrimination.

The ALJ's interim recommended order and decision were submitted to a three-member panel of the Commission for a final order and decision. On February 13, 1987, following written and oral arguments of the parties, the Commission issued an order reversing the ALJ's decision, with one panel member dissenting.

On March 16, 1987, Habinka applied for a hearing of the case before the full Commission. His application was denied in an order signed by 10 of the 12 Commission members on July 2, 1987. He then filed a timely petition with this court for review of the Commission's February 13, 1987, order dismissing his claim.

The record reveals the following undisputed facts pertinent to this appeal. Respondent Lake River was at all relevant times a public storage facility. Complainant was initially hired by Lake River on July 24, 1969, and established a work and performance history that was excellent and often praiseworthy. He started as a laborer, and following military service, returned to work in July 1972 as a forklift driver in one of the company's antifreeze warehouses. Over the next 10 years, as he progressed to increasingly more responsible positions,

he received consistently favorable performance appraisals and several letters of commendation for his work, and received regular pay raises. In 1980, he was asked to assume the position of "leadman" in another warehouse, earning $12.24 per hour. In March 1981, he was promoted to the position of "warehouse supervisor trainee," and soon thereafter to "warehouse supervisor," receiving an additional salary increase. His final performance review was in February 1982. At that time he was rated "above average" in achieving three out of five performance goals and "average" in two others. The review noted that the trend of performance since the last performance appraisal was "improving."

In late 1981, complainant began to experience severe cluster headaches and seizures. He had at least four seizures in 1981 and 1982, two of which occurred at work. Following the third seizure, in March 1982, he was hospitalized for three days. At this time his condition was labeled "seizure disorder" by a neurologist at Hines Veterans Administration Hospital in Chicago (Hines), and the drug Dilantin was prescribed. From March 1982 through mid-July 1982, his absences from work increased significantly. His absenteeism as recorded in company documents admitted into evidence shows that he was absent a total of 143.25 hours between January 1 and July 13, 1982, as compared with the other 34 salaried Lake River employees, one of whom accumulated 70 hours of absence during the same period and all others from 0 to 43.5 hours. During this period, his supervisor and upper management became increasingly concerned about the cause of his medical problems, including the severe headaches which he blamed for many of his absences, the repeated instances of "calling in sick," often on short notice, the effect of his absences on supervisory coverage, and the possibility of safety risks should more seizures occur. Finally confronting him in an effort to determine the underlying cause of his health problems, company managers learned that he was a participant in the methadone maintenance treatment program at Hines. The record clearly establishes that certain company officials were already aware of complainant's earlier problem with heroin addiction. In fact, Lake River had supplemented its employee group health insurance in 1978 in order to fully cover the cost of an in-patient detoxification program for him at Forest Hospital (Forest), a private facility in Des Plaines, Illinois. Habinka had successfully completed this program, returning to work completely "drug free" at the time. However, none of Lake River's management personnel knew in July 1982 that complainant had begun using heroin again in December 1979, had continued to use it, and had

reenrolled in the methadone maintenance program at Hines in June 1981.

Upon learning of Habinka's participation in the Hines program in July 1982, several top-level management personnel, including the company president, met with complainant, his physician, and his counselor at Hines to gain more information about methadone maintenance treatment, what effects it might have on a person's ability to perform his job, and other possible modes of treatment. Following three such meetings and further discussions, Lake River managers arrived at a decision to place complainant on an indefinite leave of absence, beginning July 13, 1982, without pay or benefits, during which time he was expected to deal with his health and personal problems. At a meeting on that date, at which Habinka was told of this decision, he apparently agreed to enter an in-patient detoxification program, involving a four- to five-week process, to completely detoxify from methadone as well as all illegal drugs. The evidence is conflicting, however, as to whether complete detoxification was made an express condition of continued employment. A letter mailed to complainant immediately following the July 13 meeting, and signed by Rodney Foster (Foster), Lake River's vice-president of operations, states in pertinent part:

"I want to summarize our discussion of today to be sure that your leave of absence is clearly understood by both of us. We are asking that you take time off without pay or benefits to deal with your health and personal problems.

We want you to keep in touch with us at least monthly to keep us informed of your status. We are not planning to fill your position in the near future until we can, through discussions with you and your doctors, determine your ability to return. Obviously, we cannot hold the position open indefinitely."

By August 10, 1982, Foster had heard that complainant was still not enrolled in a detoxification program. He drafted and signed a letter to Habinka which states in pertinent part as follows:

"On Tuesday, July 13, 1982, when you were asked to take a leave of absence for health reasons, you stated that your plans were to begin a detoxification program immediately. I have heard that you have not yet begun the detoxification program. * * *

I know that you are committed to resolving your health problems and are determined to prove yourself able to return to Lake River in a supervisory capacity. * * * Not having heard of a treatment plan other than the one you expressed on July

13, 1982, I am concerned. Please call me or stop by and let's talk about where you stand. I am still committed to giving you time to work things out, but *** the time constraints are not unlimited and a good faith effort on your part is mandatory to success."

On October 3, 1982, having received no assurance that complainant was making satisfactory progress toward resolving his "health and personal problems," Lake River terminated his employment.

In addition to Lake River business records, documentary evidence presented at the hearing included 36 pages of complainant's medical records from Hines Veterans Administration Hospital, covering the period from May 29, 1974, through March 4, 1983. These records consist of notations and summaries of physicians and counselors, including the following entries. On May 29, 1974, a "final diagnosis" of "drug dependency—heroin" was noted by complainant's physician. On July 29, 1974, "heroin addiction" was listed as an "established clinical diagnosis," and complainant was described as a "heroin addict for 2½ years, on methadone program." A physician recorded that complainant was admitted for in-patient detoxification from methadone on June 2, 1977, by his own request. After reaching the point in the detoxification program where the methadone had been reduced to the 10-milligram level, complainant signed out of the program on June 12, 1977. He resumed participation in the outpatient methadone program. In a "substance review" of July 17, 1981, a physician noted that complainant "seem[ed] to be making some progress" and had tested negative for [illegal] opiates. On October 13, 1981, Habinka complained to his counselor that his current methadone dosage level was not high enough to prevent withdrawal symptoms, and admitted to using illegal drugs during the past weekend. His dosage was increased to 60 milligrams per day as of October 14, 1981. On November 12, 1981, Habinka complained of "more frequent migraine-like headaches," for which a physician prescribed the drug Inderal. His progress in the methadone program as of December 22, 1981, was recorded as "fair," and as of January 16, 1982, as "good." However, on February 2, 1982, he requested another increase in his methadone dosage. He also informed his physician that he had consulted a private physician for his headaches and that the physician had prescribed Fiorinal (with codeine). He complained of withdrawal symptoms, stating that he "would use street opiates if he [did] not get an increase." His dosage was increased to 70 milligrams per day as of February 6, 1982.

The medical records admitted into evidence further reveal that

on March 16, 1982, a neurologist at Hines summarized complainant's condition upon discharge from observation following his third seizure. The "established clinical diagnosis" was given as "seizure disorder, etiology unknown." The results of physical and neurological examinations were "unremarkable." At this time, Habinka admitted taking "10 and 12 Darvon per day for headache." The neurologist prescribed Dilantin for his seizures, and his methadone treatment was resumed. By April 14, 1982, he was again complaining of withdrawal symptoms and admitting to "buying methadone on the street." His dosage was again increased. On June 1, his counselor recorded that complainant's progress in the methadone program was "poor," and that his supervisor [at work] was "aware of changes in [his] work" which were "brought to his attention." Three days later, his physician recorded that he "discussed with [the] staff the behavior and street opiate usage" of complainant, "who in less than one year went from 30 mg. methadone to 90 mg. methadone. [The] staff suggested that this will be the last trial to help [him]" not to use street opiates. The physician further noted that if opiate use continued, "[Hines] should refer [him] to another program and *** start decreasing the methadone."

The Hines medical records also include the recorded observations, on July 12, 1982, of complainant's counselor following a meeting with complainant, his girl friend, and representatives from Lake River. He noted that he "was able to give [the representatives] some [information] about methadone and how we presently use methadone *** at Hines." The counselor's entry for July 14 noted that Habinka reported that he had, in the counselor's words, "been given leave without pay until such time as he enters [an] in-patient unit to detox from all drugs opiates/methadone. [He] wants to go into [a] private hospital but his medical coverage will stop while on leave. [He] seems pessimistic about any inpatient treatment and overwhelmed at the thought of being drug free (methadone)." On July 21, 1982, the counselor recorded that Habinka was "requesting admittance to detox after being discharged from Forest Hospital because his insurance wouldn't cover it. Patient is using heroin about $175 per day." The following entry, by a physician, states: "[R]esume maintenance at 90 mg. pending setting up of withdrawal schedule. If he's using heroin daily, he isn't ready for a therapeutic detox." On July 22, complainant requested withdrawal as an outpatient at 5 milligrams per day until he reached 60 milligrams, at which point he wished to be screened again for in-patient detoxification. He expressed concern that he had to be drug free in about 45 more days or he would "lose

his job for sure." The records reveal that his attempt at slow detoxification as an outpatient was unsuccessful. On February 28, 1983, complainant was admitted to the in-patient drug detoxification ward at Hines for one week to stabilize on methadone. At this time, the staff physician listed the following pertinent clinical diagnoses for which treatment was given, in order of clinical importance: (1) opiate dependence—heroin, Dilaudid, methadone; (2) drug abuse—Valium, by history (other drugs); (3) alcohol abuse; (4) seizure disorder; (5) headaches. The summary report for this date also noted that complainant had two previous drug detoxification treatments at Hines, in 1975 and in 1976, and a third at Forest Hospital in 1978, but had "resumed usage of opiates" after each. As of March 4, 1983, complainant was discharged from the stabilization treatment and placed back on outpatient methadone maintenance at 100 milligrams per day. Habinka's own testimony at the hearing further revealed that in June 1983, Hines discharged him from its methadone program. He was given the option of either transferring to another program or detoxifying. The day after his discharge from the Hines program, he enrolled in the maintenance program at the Center for Addictive Problems, where he was enrolled at the time of the hearing. He also testified that he was employed at that time and had used no nonprescription drugs for the past year.

Dr. Edward Senay, a professor of psychiatry at the University of Chicago and obviously qualified as an expert in problems of drug abuse and treatment, testified as complainant's expert witness. Dr. Senay stated that he had personally treated at least 4,000 to 5,000 opiate-dependent persons, but had never treated or examined complainant.

Dr. Senay discussed medical studies which showed that repeated self-administration of narcotics creates changes in the brain and nervous system which are "more or less permanent which require constant replacement, something like the situation with diabetes." These changes can occur within one or two months of first taking the drug. While not irreversible, these changes are "very slow in [their] reversibility." They have remained detectable in former addicts who have been totally drug-free for months. Dr. Senay further testified that once opiate dependent, a person tends to develop a "career of episodes of readdiction," which he characterized as "repeated episodes of addiction, abstinence and readdiction," or "chronic relapsing." What treatment does is change the character of the person's "career" from one of readdiction with legal and physical problems, and overdoses, to one which minimizes the most serious effects of readdiction. At one

point during direct examination, the following colloquy occurred:

"Q. Is opiate dependency a disease or functional disorder?

A. Well, you have got me in a bind because pragmatically I would regard it as a disease. Intellectually, I would not regard it as a disease."

Dr. Senay testified in considerable detail as to the use of methadone maintenance in the treatment of opiate dependency. He explained that methadone, like heroin, is an opiate. In methadone maintenance therapy, subintoxicating doses of methadone which suppress the opiate withdrawal system are substituted for the heroin a dependent person would buy illegally. The idea of narcotic substitution as a treatment, as in methadone maintenance, is to give someone a dose sufficient to suppress withdrawal symptoms for an entire day, but not sufficient to induce intoxication, clouding of consciousness, slowing of reaction time, or symptoms such as depression or irritability. Dr. Senay further stated that a person on methadone, correctly administered, can "drive a car, *** teach school, or do any of the things required to make a living." His experience confirmed that people in methadone treatment programs could "mak[e] decisions that would involve substantial risks to people's financial, medical, or legal welfare." A person on methadone could be, for example, a trial lawyer, judge, or surgeon, and it would be "absolutely impossible" for even a trained professional to tell if that person were on methadone. Dr. Senay also testified that there seem to be no health consequences associated with taking methadone over long periods, even at high doses. Questioned specifically about the relationship between methadone and seizures, Dr. Senay stated that as a general rule, there is no causal relationship between methadone or other opiates and seizure disorders. Nor are headaches a frequent complaint of persons on methadone maintenance.

Dr. Senay declined to characterize methadone maintenance as "the treatment of choice" for opiate dependency. He described it as "a treatment among a number of others," and one that is "elected by more addicts than any other treatment." Dr. Senay explained that, of participants in methadone programs, about one-third do well, in that they do not steal, take other drugs, or drink, and they interact well with their families and function well at jobs. A middle third are "sort of hung between the street and being straight." The final third "don't change very much" from their existence as street addicts. In addition to methadone maintenance, and entering a drug-free, group living community, detoxification is also used to treat opiate dependency. Dr. Senay stated that he had studied the question of detoxification for

over a decade and that he "did not know anybody who is experienced in the field who believes that withdrawal has much to offer anybody as far as the long term goes." Detoxification is indicated, however, when a person desires it and is not going through a lot of stress at the time, such as would result from a divorce, loss of a job, or a new job. In answer to a hypothetical question regarding a person who had held a job for 10 years, had a long-term investment in the job, and had just found out that his job was in jeopardy, Dr. Senay stated that those factors would be "a contraindication" to detoxify.

On cross-examination, Dr. Senay agreed with the statements that (1) a successful methadone program contemplates that the addict stops taking the heroin and takes the methadone; and (2) all methadone maintenance programs envision, as clinical guidelines, a person taking the methadone as prescribed and not supplementing it with methadone, heroin, or other illegal drugs purchased on the street. He also stated that current Federal regulations require that withdrawal from all drugs, even methadone, be periodically discussed with patients in methadone maintenance programs. In his clinic, "if someone [did not] clean up after six or nine months from street drugs," he would be "administratively detoxif[ied]," i.e., "detoxified a couple of milligrams of methadone" each time he tested positive for street drugs. Finally, in regard to seizures, Dr. Senay agreed with the statement, appearing in a 1984 book which he authored, that "a history of adult onset of convulsions should raise suspicion of drug abuse." He further stated that while opiates would only rarely cause convulsions, a person "can get convulsions in withdrawal from alcohol, or any tranquilizer such as Quaaludes, Valium and Librium, Placidyls, Doridens. [T]hose would be the drugs that [a person] would get convulsions from, not opiates."

Complainant testified regarding his history of drug use and his employment history and job responsibilities at Lake River. His testimony on these matters, where pertinent, is consistent with the facts as summarized above and revealed in the medical records. He stated further that he first used heroin while stationed overseas with the Army, and was a regular heroin user when he returned to Illinois in 1972. He reported to Hines in 1973 seeking relief from withdrawal symptoms and was enrolled in their methadone maintenance program. He elected to "pick up" his methadone three times per week, Tuesday, Thursday, and Saturday, permitting him to report to Hines only twice during the work week, at lunchtime. Following this schedule, he was only occasionally five minutes late returning from his half-hour lunch period as a nonsalaried employee at Lake River. After reenroll-

ing in the Hines methadone program in June 1981, again electing to pick up his methadone Tuesdays and Thursdays at lunchtime, he told no one at a supervisory level in the company about his relapse or his participation in the program.

Complainant further testified that he suffered his first seizure in July 1981 while working in his office at Lake River. His immediate supervisor reported the seizure to Foster, who reported it to Ben Johnson (Johnson), Lake River's president. Complainant was rushed to a nearby hospital, where he told a doctor that he was enrolled in a methadone program. He recalled the doctor responding, "That's not it. What other drugs are you doing?" The doctor told him that if he were taking a lot of any tranquilizer, such as Valium, that would cause a seizure. Complainant assured the doctor that "that was not the case." Habinka further testified that he experienced his first severe headaches on Christmas day in 1980. These headaches became more severe after his seizures began, and he consulted a private doctor about pain relievers for them. The doctor prescribed Tylenol 4 and Fiorinal. Between July and November 1981, complainant testified that he was also taking, in addition to his daily dose of methadone, unprescribed Darvon and Valium, and "a lot of heroin." He recalled that following his second seizure in November 1981, Foster told him not to work alone in the warehouse, as he often did on overtime hours, or to do any high climbing. He also stated that just prior to his third seizure in March 1982, he was taking the Inderal and methadone as prescribed, as well as illegally obtained Darvon, Valium, Tylenol 4, and heroin when they were available. His third seizure occurred in a parking lot at Hines, where he was admitted to in-patient observation for three days and was diagnosed as having "seizure disorder" by a neurologist. Treatment with Dilantin began at this time.

Upon complainant's discharge from the hospital, Foster asked him for a "work release" letter from one of his doctors at Hines. Neurologist Karen Scardigli supplied one, admitted into evidence, which stated simply that "[complainant] was treated for Seizure disorder during hospitalization on Neurology ward from 3/13—3/16. He is presently on Dilantin for Seizures and may return to work." When Foster later asked to speak to one of Habinka's doctors at Hines, Habinka agreed but told the doctor "to tell [Foster] everything except that [he] was taking methadone." In late March 1982, John Lisicich (Lisicich) became complainant's immediate supervisor. Habinka stated that at this time he was still experiencing dizziness after being placed on the Dilantin, and asked Lisicich for the week of April 5 to April 8 as vacation time, which was allowed. He told Lisicich that the Dilantin was

causing side effects. He further stated that his headaches also caused him to miss work or to come into work late, after calling, and that he needed to keep doctors' appointments for tests at Hines and elsewhere.

On cross-examination, complainant admitted that he was taking, in April 1982, in addition to the Dilantin, Inderal and methadone as part of his regular treatment, Darvon, heroin, and street methadone in an irregular pattern determined primarily by availability. Complainant testified that he took more vacation time in June because he felt "uncoordinated" due to an adjustment in his dosages of Inderal and Dilantin, and told Lisicich at that time that he was taking both of those drugs. At some later time in June 1982, Habinka told his supervisor that he was in the methadone program and that he was leaving at lunchtime on Tuesdays and Thursdays to pick up his methadone. By the following day, Foster knew this as well and asked complainant whether company managers could speak to doctors at Hines to find out more about methadone.

Complainant further testified as to three separate meetings at Hines with representatives of Lake River. He recalled that the first meeting was attended by his physician, his counselor, the director of the methadone clinic, Foster, Lisicich, and himself. The meeting lasted for over an hour, and the doctor "explained everything about methadone." The doctor stated that methadone would not affect his job performance. Methadone would not affect a person's job performance "if he had his regular dosage every day without mixing it." To the best of his knowledge, no Hines staff member mentioned anything about his taking illegal drugs. Foster inquired of the doctor what was involved in taking a person off methadone. The doctor told Foster that if a person were "totally committed," he could detoxify from it. At the second meeting, attended by complainant, the doctor, the counselor, and Johnson, the methadone program was again explained. The counselor explained to Mr. Johnson that complainant needed to be totally committed to a methadone program for it to work. Habinka testified that the counselor "may have" told Johnson that he was not totally committed to the program at that time, because, in complainant's words, "I wasn't totally committed. I was taking street drugs." The Hines staff also informed Johnson that if complainant were totally committed to the program, he could detoxify, but at that stage and time, he was not ready. Complainant could not recall whether anyone at the meeting told Johnson that it would be dangerous for him to detoxify at that time. At a third meeting, attended by complainant, the same doctor and counselor, Foster, Lisicich, and

complainant's girl friend, Deborah Curry, complainant recalled that many of the same things were discussed. The counselor stated that the long-term goal of methadone maintenance in general was "first to get clean [of street drugs] and then to get off the drug." He did not recall anyone telling Foster that it would be dangerous for him to detoxify. He further testified, on cross-examination, that he did not remember whether the fact that he was taking illegal drugs in addition to methadone was brought up by anyone at any of the meetings.

Complainant further testified that following the third meeting at Hines, held on the morning of July 13, 1982, Foster scheduled a meeting at Lake River for early that afternoon. Only Foster, Lisicich, Curry and complainant attended this meeting. Foster told him that he wanted him to take a leave of absence, as Habinka personally understood it, "to get off of the drugs *** [and] to make myself personally healthy by not being on any drugs." He told Foster that he did not want the leave of absence and could "deal with it." Foster told him that he had no choice but to take the leave. When asked on cross-examination whether he had in fact been "pretty tardy and pretty absent up to that point," complainant admitted that he had been. Complainant further testified that he entered the in-patient detoxification program at Forest on the Monday following this meeting, but the Forest accounting department notified him the next day that he did not have insurance to cover the cost. He testified that he could not pay for the program himself and signed out of Forest, although he believed that he would be successful there because he had detoxified successfully at Forest once before, while he had never been successful at Hines. He began the detoxification program at Forest on July 19 and was there for "only three days."

On cross-examination, Habinka identified an undated letter which he wrote to Foster and Johnson after he was placed on the leave of absence. He did not testify as to a specific date or a more definite period of time when the letter was written or sent. This letter, admitted into evidence, requests the two men to reconsider permitting him to return to work in light of his record of loyal service to Lake River. It states in pertinent part:

> "After discussions with my counselor, we have decided a slow detoxification would be the safest way for me, since I am seizure-prone because of my epilepsy. I can detox at 2 milligrams per week, which would be almost unnoticeable."

Complainant also stated that he never had a doctor contact Foster or Johnson regarding the "slow detoxification" statement because, he believed, "it was futile."

Deborah Curry, complainant's fiancee, testified that in July 1982, she was present at a meeting at Hines along with complainant, Foster, Lisicich, the director of the Hines methadone program, and complainant's counselor in the program. The director and the counselor explained the purpose of methadone maintenance and said that the purpose was similar to a diabetic's use of insulin. Ms. Curry also recalled attending a meeting at Lake River on July 13, 1982, at which Foster, Lisicich, complainant and she were present. She testified that the only reason stated by company officials for Habinka's leave of absence was for him to "go into a hospital setting to go through the detoxification period from the methadone." Ms. Curry further stated that she specifically asked Foster if complainant's job performance had any bearing on the leave of absence. In response, Foster and Lisicich "both agreed that Jim's performance had nothing to do with the matter at hand."

Rodney Foster, then vice-president of operations at Lake River, testified that in the spring of 1980, Jim Pasarelli, warehouse operations manager, told him that complainant formerly had had a drug problem, but that he had gone through a program, had "gotten off drugs," and had returned to work. Pasarelli also told Foster that he did not view complainant's prior drug use as problematic, but simply wanted to make Foster aware of it. Foster stated that he mentioned it only to Johnson at the time, as Pasarelli had asked that they keep it in confidence. Foster then approved Pasarelli's recommendation that Habinka be offered the position of warehouse leadman.

Foster further testified that during the remainder of 1980, he had occasion to work with complainant frequently on warehouse inventories. He remembered that Habinka attended work regularly and "did an excellent job." In March 1981, Habinka was promoted to the position of warehouse supervisor trainee. When Habinka returned to work following his second seizure, Foster cautioned him about not climbing on product stacks in the warehouse to avoid injuring himself, should he have another seizure. At this time complainant told Foster that he was taking medication and that the dosage was being adjusted. He added that when the dosage was correct, the medication should work to prevent any more seizures. Foster also recalled that Habinka was experiencing some headaches and had begun to miss some work as a result. Between November 1981 and February 1982, Foster saw Habinka once or twice each week. Complainant had missed some work and was expressing concern about severe headaches which he said were responsible for his absences. Foster stated that during this period, no one in management discussed Habinka's absences with him,

but Foster occasionally expressed concern about his health. According to Foster, Lake River's management personnel believed that they "were dealing with epilepsy" at the time of Habinka's performance appraisal in February 1982 and that complainant was "going to get that under control by getting his medication balanced out."

Foster further stated that he spoke with Habinka immediately after he returned from hospitalization following his third seizure in March 1982. He testified that, in his view, "things seemed to be getting worse instead of better," so he asked complainant to produce a doctor's release, which he did. Immediately after John Lisicich became Habinka's new supervisor in late March 1982, he expressed concern to Foster about Habinka's attendance, particularly his being late some days and taking long lunch hours. Lisicich also reported that Habinka's communication with him had been "different" recently, and that once Habinka had untypically "come into the office and unloaded on him." By April, Lake River's vice-president of personnel, Robert Hoffman (Hoffman), had reported some of complainant's repeated absences to Foster. Foster then told Lisicich to keep him (Foster) informed of complainant's every absence, and to speak to Johnson about their concern. Foster stated that by mid-May 1982, the absences had become such a serious concern that he told Habinka that he needed more information about his health problems and wished to have that information directly from a physician, and to "pass on" to a physician information about the personality changes observed by complainant's supervisors. Following his conversation with an unnamed physician at Hines, Foster wrote a memorandum for the file and sent copies to Hoffman and Johnson. The memorandum, dated May 17, 1982, states in pertinent part:

> "I talked to Jim Habinka's doctor today. He does not feel that the Dilantin which Jim is taking for epilepsy will cause a personality change. ***
>
> He says that he's aware of Jim taking medication for headaches, which should only cause short-term reactions of dizziness and confusion.
>
> I expressed concern over Jim's missing some work on short notice and changing work habits. He stated that Jim did seem under stress and that he had expressed concern about losing his job."

Despite his conversation with the doctor, Foster stated, he did not feel as though "we had reached a resolution."

Foster also testified regarding the effect of complainant's absences on Lake River's day-to-day operations. He stated that when-

ever Habinka was absent, Lisicich had to find people to cover Habinka's shipping and inventory responsibilities, or leave them undone. At a time when business was poor, "that was of great concern." Lisicich also reported not being able to do some of his own work because Habinka was gone a great deal of the time. By mid-June 1982, Foster believed that complainant had "basically lost all credibility with the warehouse people *** he supervise[d]," because "he was not able to be there." At this point he confronted Habinka directly, informing him that the company had to have more information about his health if he were to continue in his supervisory position. As related by Habinka, the admission that he was in the methadone maintenance program followed. According to Foster, Habinka suggested that company officials visit Hines to find out more about the program.

Foster's testimony regarding the general information presented by the Hines clinic staff does not differ materially from Habinka's. Following the first meeting at Hines, Foster reported what he had learned to Johnson. Management felt that they could benefit from more information, and a second meeting with Foster and Lisicich was arranged, also attended by Habinka's counselor. At this meeting, Foster recalled, he told the counselor that Habinka's employers were trying to get some information about what they could expect in terms of his going through the program from a standpoint of how that would affect his ability to do his job, and he also mentioned the "types of performance" that management had recently observed, including his attendance pattern and "behavior that was not typical of his personality." The counselor responded that he believed complainant could resolve some of the "personal issues" he had, an important part of the program, if he would "get committed to resolving them and to date he had not done that." Foster also recalled that at some point in time, not necessarily at one of the Hines meetings, complainant had mentioned to him that he had "gotten back on heroin" and occasionally still took heroin. However, no one on the Hines staff brought up the subject of illegal drugs; nor was Dilantin or epilepsy discussed at any meeting he attended. Foster stated that the subject of reducing the dosage of methadone gradually was discussed, and it was his understanding that Habinka was already in that type of "program of dose-reduction" at that time.

Following the Hines meetings, Foster, Lisicich, Hoffman and Johnson reviewed the information obtained. Their decision was to suspend complainant because, as Foster stated, "it was too great a risk in our mind for him to work in the warehouse while he was going through his drug program." They also decided to ask that Habinka

"show some strong commitment to resolving his problem." During these discussions, someone recalled that Pasarelli had once mentioned complainant's drug problem. Foster contacted Pasarelli because he believed the company now faced a similar situation. Pasarelli told Foster that Habinka had been given time off to go into an institution to "get off the drugs" and that he had done so and returned to the company. Foster further testified that the officials decided that they "should not be lenient" about insurance coverage, having covered the cost of detoxification once already, because they "were trying to tighten the conditions to assure that there was some commitment there."

At the meeting with complainant on July 13, 1982, Foster told him that he needed to get committed to resolve his drug problem. Habinka told him that he had gone into a certain hospital to detoxify previously and that he was going to go through that program. The officials encouraged him to proceed with that plan. According to Foster's testimony, the leave of absence was completely open-ended, and there was no stipulation that complainant necessarily do a fast detoxification in three weeks. He denied telling complainant that the company would not be able to tolerate having a supervisor on methadone. Answering direct questioning by ALJ Gonzalez, Foster stated that what Lake River management wanted was some way to measure whether the performance problem had been resolved, "a means of measuring that when [complainant] came back, he was not going to be missing all this time, or he was going to be back to a performance level that he was at before." Because Habinka had detoxified from all drugs for some period of time in the past, Foster personally believed that for him to do that was "a reasonable thing to expect."

John Lisicich testified that when he and Habinka were both warehouse supervisors, he had daily contact with complainant as they worked together on projects. Lisicich continued to see him daily after he was made "warehouse coordinator" in late August 1981. He was present when complainant suffered his second seizure in November 1981. Lisicich recalled that following the second seizure, complainant occasionally became moody and depressed, and would sometimes "snap at people."

Lisicich further stated that one of his duties as warehouse coordinator was to fill in for absent supervisory staff. He recalled that from January through March 1982, he had difficulty completing his special projects for managers because he was filling in for other employees, "primarily Mr. Habinka." He reported this situation to Glenn Gibisch, Habinka's immediate supervisor, who requested that Lisicich continue to cover for complainant whenever he was absent, because it was im-

portant to have a supervisor in the warehouse. During this time, Habinka told Lisicich that he was taking "Dilantin," but mentioned no headache medication. Whenever he "called in sick," reporting to Gibisch or Lisicich, Habinka would state that he "wasn't feeling well" and "wouldn't be in" that day, and would say that his headaches were the problem.

In late March 1982, Lisicich was promoted to "warehouse manager," and became Habinka's immediate supervisor. At that time, he believed that the reasons for complainant's first two seizures were "epileptic" and instructed him to continue his practice of never working alone or operating machinery. In early April 1982, when Habinka requested a week's vacation time to "help him straighten out this problem and pull himself back together," Lisicich readily assented because complainant seemed depressed about the seizures and their possible impact upon routine life activities. However, Habinka's absences continued after he returned to work, and there were times when the warehouse went unsupervised. Lisicich recalled telling Habinka at this point that while he understood some of the reasons for his absentee problem, "it was obviously intolerable that it could continue in this manner," and that if "[complainant] didn't resolve the problem, he was in danger of losing his job." Complainant told Lisicich that his doctors were trying to adjust his level of Dilantin and that he would attempt to resolve the situation.

Lisicich further testified to an instance which occurred on May 8, 1982. Complainant had been expected to arrive at 8 a.m. to set up and begin an important, day-long annual inventory. He never arrived and did not call until 1 p.m. to report that he was too ill to come into work. Unsatisfied with complainant's explanations for his continuing absences, Lisicich confronted him, asking whether there was not something more that Habinka was not telling him. Complainant then admitted that he was on methadone, that methadone was a substitute for heroin, and that he was picking up his methadone during lunch hours. Lisicich stated that he understood this conversation to mean that "methadone" was Habinka's explanation for his absence problem. Lisicich reported this information to Foster, who told him that upper management had "suspected this," and had spoken to Pasarelli, who had told them that Habinka had once detoxified from heroin addiction. Johnson then asked Lisicich to "find out as much as possible about methadone." Habinka suggested that Lisicich accompany him on one of his routine trips to pick up his methadone at Hines.

Subsequently, Johnson asked Lisicich and Foster to return to Hines for more information. Lisicich testified that at that time, com-

plainant's counselor explained that a methadone maintenance program had two purposes: (1) to give an addict a substitute for heroin to reduce crime and anti-social behavior; and (2) to try to "wean the addict from the methadone because methadone was just as addictive as heroin, being a [heroin] substitute." According to Lisicich, the counselor also stated that in his experience, many addicts could not detoxify, but the reason "was not physical," but "mental." The counselor personally believed that complainant did not possess the will to detoxify from methadone. Lisicich could not remember anyone advising against detoxification for Habinka or saying that it would be dangerous for him to detoxify. He further related that no one at the Hines meeting he attended mentioned Dilantin, Inderal, or "any other drugs whatsoever."

Lisicich also testified about Lake River's decision to place complainant on a leave of absence "in order to resolve the situation so his absences would cease when he reported back to work." At the meeting at which this decision was made, Lisicich told Foster and Johnson that he was very pessimistic about this solution because Habinka had been "saying right along" that the situation would be resolved, and it had not been resolved. He further testified that by that point, the situation for him, in his position, had become "intolerable." He admitted voicing his concern at this meeting that the company could not have a manager on methadone "if a manager on methadone would have the continual absences" complainant had and would "put that kind of burden on the company." He recalled, however, that Foster and Johnson believed that Habinka so valued his job that they could import to him the seriousness of the situation by placing him on leave, and also "give him the impetus to resolve the problem." According to Lisicich, complainant was so informed at the July 13, 1982, meeting. Lisicich further stated that "Mr. Habinka's job performance was not discussed at any of these meetings because his job performance was fine when he was at work. The issue was his absences."

Ben Johnson, former president of the Terminals Division, Lake River Corporation, testified through his evidence deposition that he had final authority for all terminations at Lake River at the time complainant left the company. He stated that he was responsible for complainant's termination.

Johnson recalled meeting Habinka in January 1980, soon after he joined Lake River as president. He was very impressed at the time with complainant's dedication and hard work. Johnson testified that, in July 1980, during a conversation with him about another matter, Habinka admitted that he had had a drug problem when he returned

from military service and that the problem had continued until he detoxified. Habinka also told Johnson that he had been "clean" for about three years. Johnson stated that he considered Habinka's revelations an indication of "courage and commitment" on Habinka's part.

Johnson further testified that following Habinka's third seizure, he and the other managerial personnel "became frightened," especially about his safety in a 300,000-square-foot warehouse with numerous aisles. He further related that on his biweekly visits to complainant's warehouse, he began to notice some changes in his demeanor. Habinka appeared to be "more calm, more quiet, not as quick paced," and "subdued." However, Johnson assumed that these changes were attributable to the medication which complainant was taking to prevent seizures. Johnson also became aware of Habinka's increased absences when Foster raised the issue at weekly managerial staff meetings. He instructed Foster to "watch the situation." Although Foster told Johnson in mid-May 1982 that Habinka was becoming unpredictable and having "lapses," and suggested that perhaps Habinka's medication was too strong, Johnson stated that he never considered, much less mentioned, complainant's prior drug problem in reference to these occurrences.

Johnson also testified about his response to Foster's report that complainant had admitted a current drug problem to his immediate supervisor. He recalled telling Foster that they "had better get all the way into this and find out exactly what the dependency is, what drug is involved, what the treatment is, what the likelihood of rehabilitation is," and "all the ramifications of it." After attending a meeting with the Hines staff, Foster reported to Johnson that Habinka had been under the constant care of Hines "all the time," and that he had not been free from drugs in 1980. While Johnson was pleased to hear that complainant's drug dependency was not "untreatable," he was concerned about the "interruptions" in complainant's work over the past seven months and resolved to meet with the Hines staff to personally obtain further information about the possibility of a "complete cure."

Johnson recalled attending a meeting at Hines with complainant's physician and counselor. He asked them whether there was "anything we could do other than this maintenance" because that "seemed to *** be prolonging the same thing." Johnson also recalled asking Habinka directly, at this meeting, why, if methadone worked, it had broken down in his case. Habinka replied that he sometimes "got tied up" and missed appointments, and that he might then "take something else." Johnson stated that he assumed complainant was imply-

ing that he obtained something "off the street." Johnson knew that Lake River had never told Habinka that he could not pick up his methadone at the appointed time. Johnson asked the doctor to explain how detoxification worked. The doctor stated that if a person could withstand the process for 60, or sometimes as long as 120, days, if necessary, he would be "clean" thereafter as long as he avoided drugs. Johnson then asked complainant, "What about detox?" Habinka responded that he could not detoxify because he had tried it before and it was "too torturous." The physician conceded that Habinka had a "will power problem" and that he did not have the strength to keep up a detoxification. Johnson admitted that the doctor told him that it was unlikely that complainant would successfully complete a detoxification and "recommended that Jim stay on methadone." However, Johnson was "convinced that methadone was not going to work" in complainant's case because of his "getting tied up at work," as Habinka was "very involved in his work." He also did not believe that methadone maintenance was going to result in a "long term change."

Johnson further testified that the decision to place Habinka on leave for a time which Lake River assumed "could be from 60 to 120 days," although not specifically restricted, was made to demonstrate to him that "in order to function in [his] capacity fully," he would have to "get rid of the chemical problem." He acknowledged that complainant was frightened about returning to Hines for another detoxification attempt. However, Lake River management wanted to make it very clear that "things [were] over until [he got] this straightened out." Johnson recalled that he spoke to Habinka personally, either at a separate meeting or by telephone, shortly after July 13, 1982, during what he described as a "very brief conversation." When complainant said that he did not think he could do the detoxification, Johnson told him to get on his way to the hospital, and to "stop stalling." It was, Johnson stated, "a very stern refusal on my part to bend." Johnson's testimony included the following colloquy:

"Q. Was it your position that the Company not have a supervisor on Methedone [sic]?

A. No, because the doctor had given me lots of examples of people that were successfully doing it. The problem was the intermittent nature of taking the medicine. The doctor attempted to disuade [sic] me from this detoxification position that I was going toward, because he said, 'I can give you reams of examples of people performing on Methedone [sic].' And he made the analogy to insulin diabetes. He said, if you stay with this it

works, there is no question about it.

Q. And what was your position in light of that information?

A. That I had too much showing that Jim couldn't stick with this. And the fact that he told me about the will power problems was not, to me, promising that I would have a permanent solution."

Johnson further related that Habinka telephoned him after receiving Foster's letter of August 10, 1982. Complainant told Johnson that the private hospital he preferred over Hines for detoxification had turned him away because he did not have insurance. Johnson responded that detoxification would not be any "more pleasant" at that location than at Hines, that the Hines staff knew him and would work with him, and that he had to "keep his part of the bargain." Johnson further stated that he was aware at the time of this conversation that the Hines in-patient detoxification program was free. Johnson also admitted reading the undated letter from Habinka referring to the possibility of a "slow detoxification." Although he did not understand what was meant by "detoxifying at 2 milligrams per week," he assumed that the "doctor had given up on detoxification and realized that this was a compromise, better than no program." He described his general impression of the letter as an attempt to "soften [him] on the methadone program and so reconsider the detox." On cross-examination, Johnson stated that complainant's physician at Hines said nothing about the possible consequences of an unsuccessful detoxification and that he did not ask. Nor did he discuss with anyone the merits of the "slow detoxification" suggested in complainant's letter.

Dr. Hector Sabelli, a psychiatrist, neurologist and pharmacologist, testified as an expert witness for Lake River. At the time of the hearing, Dr. Sabelli was professor of psychiatry at Rush University and director of the psychobiology laboratory at Rush-Presbyterian St. Luke's Hospital. He was also an attending physician at the hospital, treating both drug addicts and drug abusers as part of his practice. His medical practice mainly involved patients who were referred to him from methadone clinics or by other psychiatrists for help with psychological problems. Dr. Sabelli is the author of a book on the subject of how the regulation of the brain by natural substances is altered by the administration of drugs, and at the time of the hearing was completing a paper on the effects of opiates on the metabolism of a brain hormone. He had never examined or treated the complainant, but had reviewed his medical records prior to testifying.

Dr. Sabelli stated that methadone, taken as prescribed in appropriate dosages, does not cause headaches, dizziness, or seizures. Only

with "very, very high" doses can one have symptoms of spinal cord stimulation which may lead a person "susceptible to [them] *** to seizures." He further testified that, based upon a reasonable degree of medical and scientific certainty, the methadone dosages prescribed for Habinka would have been "very unlikely" to have caused headaches or seizures, and these dosages would not have impaired his job performance. He also stated, based on a reasonable degree of medical and scientific certainty, that he would expect the specific combination of drugs that complainant admitted to taking throughout the first half of 1982, namely, methadone, heroin, Darvon, codeine, and Valium, in the apparently significant doses taken, to impair his ability to work and his attendance, and to cause decreasing motivation and periods of sedation. They could also affect his behavior. Therefore, it was reasonable to believe that his absenteeism during this period was related to his multiple drug use and that it was "very unlikely that he could function properly at his job."

Dr. Sabelli further testified that the aim of methadone maintenance treatment is to "keep the person at a stable dose if it is not possible to decrease it." The idea of increasing the dosage, as was done in complainant's case, from 30 milligrams per day to 90 milligrams per day in less than a year, is "against *** the whole philosophy of treatment." Based on his review of the medical records, he stated that complainant was technically a multiple drug abuser, although primarily an abuser of opiates. He explained that most of the drugs taken by complainant were "related to the same family of drugs," except for Valium, which "belongs to a different drug class and the problems are very, very different and the effects of the combination may be very variable." He further explained that there is such chemical similarity between Darvon and methadone that they produce the same basic effect in the brain and the primary action of both occurs in the brain's opiate receptors. Therefore, what one is essentially doing when taking heroin and Darvon in addition to methadone, in terms of effect, is "increasing the dose of any one of them."

Dr. Sabelli was unable to state a definite medical opinion as to what caused complainant's seizures. He testified that three factors which favored seizures in his case were (1) taking Valium intermittently, leading to possible Valium withdrawal, which is a commonly occurring cause of seizures; (2) taking high dosages of opiates; and (3) purchasing street drugs, which could be laced with strychnine, a seizure-producing substance. Additionally, he observed that the medical record established that the physician who treated him "probably thought that [the seizures] might be related to the drug abuse because

he specifically did not label it epilepsy and abstained from prescribing an anti-epileptic medication until the third seizure." On cross-examination, Dr. Sabelli stated that "by far the most common cause" of seizures is epilepsy, but that epilepsy usually tends to start at a "much earlier age." He also agreed that in some cases, the treating physician is not able to establish any cause for seizures.

OPINION

This is a case of first impression in Illinois, placing before the court the question of drug dependency and its qualification as a "handicap" for purposes of employment discrimination claims under the Human Rights Act. The facts of this case, gleaned from a careful review of the record, illustrate the complexity of drug use and drug dependency as personal and societal problems. They also demonstrate the considerable challenge facing the legislature and other State policymakers charged with finding fair and effective solutions. Our task, as a court of review, is the narrow one of determining whether the Commission's decision in this case was erroneous as a matter of law. We begin by stating the statutory provisions and administrative rules pertinent to our determination, and the standard of review to be applied.

▮▮ ▮ The Illinois Human Rights Act prohibits discrimination in employment against the physically or mentally handicapped. (Ill. Rev. Stat. 1987, ch. 68, par. 1—102(A).) Section 1—103(I)(1) of the Act states in relevant part:

> "(I) Handicap. 'Handicap' means a determinable physical or mental characteristic of a person, including, but not limited to, a determinable physical characteristic which necessitates the person's use of a guide, hearing or support dog, the history of such characteristic, *or the perception of such characteristic* by the person complained against, which may result from *disease, injury, congenital condition of birth or functional disorder* and which characteristic:
> (1) *** is *unrelated to the person's ability* to perform the duties of a particular job or position." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 68, par. 1—103(I)(1).)

The relevant provisions of the Joint Rules of the Department of Human Rights and the Human Rights Commission: Handicap Discrimination in Employment (interpretive rules), which interpret the statutory definition above, read as follows:

> "Section 2500.20 What Constitutes a 'Handicap'
> * * *

(b) *Determinable Physical or Mental Characteristic*

(1) The definition is not confined to only those physical and mental conditions which are grave or extreme in nature. However, it is interpreted as excluding:

(A) conditions which are transitory and insubstantial, and

(B) conditions which are not sufficiently debilitating or disfiguring.

(2) To be covered, a condition must be 'determinable' by recognized clinical or laboratory diagnostic techniques.

(c) *Resulting from Disease, Injury, Congenital Condition of Birth or Functional Disorder—*

If a dispute arises as to whether a condition constitutes a handicap, it is the burden of the person claiming the handicap *to establish* that the condition results from disease, injury, congenital condition of birth or functional disorder. For example, the conditions of obesity and *drug or alcohol abuse shall not be deemed 'handicaps' unless the person can demonstrate that the condition arises from or constitutes the equivalent of a disease or functional disorder.* (Even where alcohol or drug dependence is established as constituting a disease or functional disorder, see paragraph (d) below regarding whether the condition is 'unrelated to the person's ability.')

(d) *Unrelated to the Person's Ability to Perform*
\*\*\*

(2) \*\*\* [A] person's condition is related to his/her ability if it would make employment of the person in the particular position demonstrably hazardous to the health or safety of the person or others, *or if it is manifested or results in behavior (e.g., absenteeism, poor quality or quantity of production, or disruptiveness) which fails to meet acceptable standards.* \*\*\* [A] *person's alcoholism or drug dependence which is manifested in excessive absence or tardiness,* or intoxication at work, is *presumptively related* to the person's ability to perform.

Section 2500.30 Who Is Protected Against Handicap Discrimination

(a) Section 1—103(I) of the Act provides that a person is protected against discrimination if he/she

(1) is currently afflicted with a condition which constitutes a 'handicap,' or

(2) has a history of affliction with such a condition; or

(3) is perceived by an employer \*\*\* as being or having been so afflicted.

(b) \*\*\* The *'perception'* of a handicapping condition may occur with regard to an individual who has been misdiagnosed, misclassified, or erroneously viewed as one who is or has been so afflicted; such an individual similarly is protected against discrimination based upon that erroneous perception. Such a perception may also occur in connection with a person whose current non-disabling condition, e.g. hypertension, is viewed as creating the potential for future disability." (Headings emphasis in original; other emphasis added.) 56 Ill. Adm. Code §§2500.20(b), (c), (d), 2500.30 (1985).

■■ ■ It is well settled that a court reviewing a decision of the Illinois Human Rights Commission must uphold that decision unless it is based on facts which are contrary to the manifest weight of the evidence addressed in the record. (Ill. Rev. Stat. 1987, ch. 68, par. 8—111(A)(2); *Department of Corrections v. Adams* (1986), 146 Ill. App. 3d 173, 496 N.E.2d 1138.) While the Act directs the Commission to adopt the hearing officer's findings of fact if they are not contrary to the manifest weight of the evidence (Ill. Rev. Stat. 1987, ch. 68, par. 8—107(E)(2)), it also mandates that the court reviewing final orders of the Commission must sustain the findings of the Commission unless such findings are contrary to the manifest weight of the evidence (Ill. Rev. Stat. 1987, ch. 68, par. 8—111(A)(2); *Acorn Corrugated Box Co. v. Human Rights Comm'n* (1989), 181 Ill. App. 3d 122, 136, 536 N.E.2d 932, 941; *Carver Lumber Co. v. Human Rights Comm'n* (1987), 162 Ill. App. 3d 419, 424, 515 N.E.2d 417, 421). Thus, the reviewing court's function is limited "to ascertaining whether the final decision of the *administrative agency* \*\*\* is against the manifest weight of the evidence." (Emphasis in original.) (*Adams*, 146 Ill. App. 3d at 180, 496 N.E.2d at 1143.) We do not pass upon the propriety of the Commission's determination that the findings of the ALJ were contrary to the manifest weight of the evidence. Rather, we review the "actual determination of the Commission just as if the Commission were the original fact finder." (*Carver Lumber*, 162 Ill. App. 3d at 424, 515 N.E.2d at 421.) In order to set aside an agency finding as against the manifest weight of the evidence, the reviewing court must be able to say that all reasonable and unbiased persons, acting within the limits prescribed by law and drawing all inferences in support of the agency's finding, would agree that the finding is erroneous. *Daniels v. Police Board* (1976), 37 Ill. App. 3d 1018, 1023, 349 N.E.2d 504, 508.

■■ ■ Under the Administrative Review Law, the scope of judicial review extends to all questions of law and fact presented by the entire record. (Ill. Rev. Stat. 1987, ch. 110, par. 3—110; *Acorn Corrugated Box Co.*, 181 Ill. App. 3d at 136, 536 N.E.2d at 941.) Although the court may not reweigh the evidence, determine the credibility of witnesses (*Adams,* 146 Ill. App. 3d at 180, 496 N.E.2d at 1143), or substitute its judgment for that of the Commission, the Commission's order must rest upon competent evidence and be supported by the record (*Acorn Corrugated Box Co.,* 181 Ill. App. 3d at 136, 536 N.E.2d at 941). The appellate court may affirm the agency's decision on any basis appearing in the record, regardless of the actual findings and rulings of the agency. (*Pepsi-Cola General Bottlers, Inc. v. Human Rights Comm'n* (1985), 137 Ill. App. 3d 288, 293, 484 N.E.2d 538, 541.) Our task is to determine whether the final decision of the Commission was just and reasonable in light of all the evidence presented. *Acorn Corrugated Box Co.,* 181 Ill. App. 3d at 136, 536 N.E.2d at 941.

■■ In analyzing discrimination cases under the Human Rights Act, Illinois courts follow the three-step analysis enunciated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817, and *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089. (*Kenall Manufacturing Co. v. Human Rights Comm'n* (1987), 152 Ill. App. 3d 695, 701, 504 N.E.2d 805, 808-09.) Under this analysis, the employee has the initial burden of proving by a preponderance of the evidence a *prima facie* case of unlawful discrimination, thereby raising a rebuttable presumption of discrimination. The employer then has the burden of stating a legitimate, nondiscriminatory reason for its employment decision, which has the effect of successfully rebutting the presumption of unlawful discrimination. The burden then shifts to the employee to prove by a preponderance of the evidence that the legitimate reason offered by the employer was not the true reason underlying its decision, but, instead, merely a pretext for discrimination. The ultimate burden of proving that the employer engaged in intentional discrimination remains at all times with the employee. *Burdine,* 450 U.S. at 252-53, 67 L. Ed. 2d at 215, 101 S. Ct. at 1093; *Acorn Corrugated Box Co.,* 181 Ill. App. 3d at 136-37, 536 N.E.2d at 941; *Kenall Manufacturing Co.,* 152 Ill. App. 3d at 701, 504 N.E.2d at 809.

■ To establish a *prima facie* case of handicap discrimination under the Act, a complainant must prove: (1) that he is handicapped within the definition of the Act; (2) that his handicap is unrelated to

his ability to perform the functions of the job he was hired to perform; and (3) that an adverse job action was taken against him related to his handicap. (*Acorn Corrugated Box Co. v. Human Rights Comm'n* (1989), 181 Ill. App. 3d 122, 137, 356 N.E.2d 932, 941-42; *Kenall Manufacturing Co. v. Human Rights Comm'n* (1987), 152 Ill. App. 3d 695, 701, 504 N.E.2d 805, 809.) In the case at bar, Habinka charges that Lake River discriminated against him by terminating his employment for reasons related to his alleged physical handicap, namely, opiate (heroin/methadone) dependency. In order to sustain his burden of proving intentional handicap discrimination prohibited by the Act, he must first establish a *prima facie* case. Therefore, the threshold issue in determining the merit of his claim is whether or not he is "handicapped" within the statutory meaning of that term as it is defined.

The ALJ found that Habinka had established a *prima facie* case because (1) the expert testimony and other evidence presented regarding the "demonstrable and permanent physiological changes" caused by such addiction established that his condition of heroin/methadone dependency is the equivalent of a disease or functional disorder; (2) the evidence also established that this condition was unrelated to his ability to perform his job as a warehouse supervisor; and (3) Lake River's president "virtually admitted" that he terminated Habinka because he was addicted to methadone and could or would not detoxify from it, following an "ultimatum" that he either end his methadone dependency or lose his job. Therefore, in the ALJ's view, Habinka suffered an adverse job action related to an actual physical handicap which was itself unrelated to his ability to perform. He also suffered an adverse job action by virtue of his employer's perception that he suffered from the handicap of methadone dependency. The ALJ further found that "excessive absenteeism," the reason for firing him articulated by Lake River at the hearing, was a mere pretext, as methadone detoxification was the sole condition of continued employment stated at the time of complainant's termination. Accordingly, the ALJ concluded that Lake River engaged in unlawful handicap discrimination in violation of the Act and recommended to the Commission that it enter a final order to that effect. In his discussion of these findings, the administrative law judge further stated:

> "Because the [ALJ] finds that Respondent made discontinuance of methadone treatment an express condition of complainant's continued employment, this case turns completely upon whether heroin/methadone addiction can qualify as a handicap under the Act, and if so, whether Complainant established that

*his addiction* is in fact a handicap or perceived handicap." (Emphasis added.)

In its order reversing the decision of the ALJ, the Commission panel stated that it was presented with a two-fold inquiry: (1) to first determine whether [Habinka's] condition was a "qualifying condition," or "handicap," under the Act; and (2) if his condition did qualify as a handicap under the Act, to then determine whether his condition was unrelated to his ability to perform his job satisfactorily. With regard to the first of these questions, the panel noted that "[t]he Commission's rules make it clear that a person is not protected under the Human Rights Act because the person abuses drugs." The burden of proof is on a complainant to prove by a preponderance of the evidence "that his drug taking arises from or constitutes the equivalent of a disease or functional disorder." The panel further stated that if a complainant fails to meet this "fundamental burden of proof, he is not protected under the Act, even if his drug taking does not affect his ability to do the job in question." Having reviewed the evidence presented by the parties, the panel further noted that Habinka's medical expert had refused to state that opiate dependency could generally be categorized as a disease, and that it was unclear whether opiate dependency, in general, "is a disease within the meaning of the Commission's [interpretative] rules" on handicap discrimination. Furthermore, there was "no evidence that [Habinka's] specific condition fits within the Commission's rules." The panel went on to state that "in a case of this sort, if the complainant is going to rely on the diagnosis of a physician, then the opinion of that physician must be established *directly in the record*." (Emphasis added.) As Habinka did not call his treating physicians to testify, it was not for the ALJ to "surmise their opinions based on the implications of their treatment." Accordingly, the panel found that, absent "competent evidence" on the issue of whether Habinka suffered from a disease, such as "alcoholism," rather than from "drug abuse," the ALJ's finding that he suffered from an actual handicap within the meaning of the Act must be reversed.

With respect to the ALJ's "perceived handicap" finding, the panel stated that its reading of prior decisions of the Commission led to a conclusion that "a person will be protected [under the Act] if that person is perceived by his or her employer to have a condition *which would be a handicap* under the Human Rights Act." (Emphasis added.) Because Lake River's officials were told by Habinka's physicians and counselor that Habinka lacked the commitment and motivation to attempt detoxification from methadone, the panel could not

"say that [Lake River] acted on the basis of a perception that [Habinka's] use of methadone arose from or constituted the equivalent of a disease or functional disorder," nor was there any evidence in the record to support such a perception. Therefore, it concluded that the ALJ's determination that Habinka was perceived to be handicapped was also against the manifest weight of the evidence.

Having reversed the ALJ's findings on grounds that Habinka had failed to prove that his condition, actual or perceived, was a legally cognizable handicap under the Act, and that he therefore had failed to establish a *prima facie* case, the panel did not address the question of whether his condition was related to his ability to perform his job. Moreover, under the Commission's analysis, because the burden never shifted to the employer to articulate a legitimate reason for its action, the question of whether Lake River's articulated reason was a pretext did not arise. If we determine that the Commission's finding, that complainant failed to establish by the preponderance of the evidence that he suffered from either an actual or perceived handicap, was not contrary to the manifest weight of the evidence, it will likewise be unnecessary for this court to proceed beyond this initial stage of the three-step *McDonnell Douglas* analysis in order to affirm the Commission's decision.

In challenging that decision, complainant first contends that the Commission ignored substantial and compelling evidence in the record which clearly established that his condition did, in fact, constitute the equivalent of a disease or functional disorder. He points to repeated diagnoses of opiate dependence as documented by his medical records. He maintains that the chronic nature of his drug addiction was clearly shown by clinical diagnoses extending over a period from May 1974 ("drug dependency—heroin") through February 1983 ("opiate dependence—heroin, Dilaudid, methadone"). Complainant argues that the medical records, together with his own testimony regarding his long history of drug dependence and that of Dr. Senay regarding the changes in an addict's brain and nervous system, requiring constant drug replacement, "something like the situation with diabetes," clearly established that he was an opiate-dependent person at all times pertinent to this case and not simply a casual user or abuser of drugs. As further evidence of his chronic condition, he cites Federal regulations requiring a diagnosis of physiological dependence on opiates for a period exceeding one year in order for a person to participate in a licensed methadone program such as the Hines program. See 21 C.F.R. §291.505(d)(3)(i)(A) (1989).

■ ■ However, whether or not the evidence established that

Habinka was chronically opiate dependent, as opposed to being a casual opiate user, is not the dispositive issue in determining whether his condition qualifies as a "handicap" under the Human Rights Act. Both the statute and the Commission's rules are clear as to what is required before a condition may be deemed a cognizable physical handicap for purposes of employment discrimination. It must be "a determinable physical characteristic *** which may result from disease, injury, congenital condition of birth or functional disorder *** which *** is unrelated to the person's ability to perform the duties of a particular job." (Ill. Rev. Stat. 1987, ch. 68, par. 1—103(I)(1).) The interpretive rules further state that it is the complainant's burden to establish that his condition meets this definition, and specifically, in the case of drug abuse, to "demonstrate that the condition arises from or constitutes the equivalent of a disease or functional disorder." (56 Ill. Adm. Code §2500.20(c) (1985).) It is well settled that rules adopted by an administrative agency pursuant to statutory authority have the force and effect of law and that the agency is bound by the rules. (*Department of Corrections v. Illinois Civil Service Comm'n* (1989), 187 Ill. App. 3d 304, 308, 543 N.E.2d 190, 194; *Hetzer v. State Police Merit Board* (1977), 49 Ill. App. 3d 1045, 1047, 365 N.E.2d 261, 263.) Agencies are afforded substantial discretion by a reviewing court in construing and applying their own rules, and a reviewing court should interfere only when the agency's interpretation is plainly erroneous or inconsistent with long-settled constructions. *Neff v. Miller* (1986), 146 Ill. App. 3d 395, 402, 496 N.E.2d 1073, 1077.

In the case at bar, the Commission found that Habinka had not met his burden of establishing that his opiate dependency was, as alleged in his complaint, "a determinable mental or physical characteristic resulting from a disease or functional disorder." Having carefully reviewed the record, we cannot say that the Commission's finding is against the manifest weight of the evidence. First, neither complainant's nor respondent's expert testified as to medical facts or opinions which would "establish" that either opiate dependency in general, or complainant's condition in particular, constituted a disease, functional disorder, or the equivalent. Dr. Senay was directly confronted with this question by complainant's counsel, yet he declined to unequivocally characterize opiate dependency as either a disease or functional disorder. Although he would "pragmatically" regard it as a disease, he would "intellectually" not regard it as a disease. He did not state an opinion as to whether opiate dependency was a functional disorder, and was not asked to elaborate on his answer during either direct or cross-examination. Dr. Senay did refer to

studies showing that repeated self-administration of narcotics creates "more or less permanent" brain and nervous system changes "which require constant replacement, something like the situation with diabetes" and are "very slow in their reversibility," although not irreversible. This testimony could reasonably be viewed as insufficient to establish that opiate dependency constitutes the equivalent of a disease or functional disorder. Respondent's expert, Dr. Sabelli, was neither asked nor volunteered an opinion as to whether opiate dependency was, or constituted the equivalent of, a disease or functional disorder. Nor did he state or imply that complainant's condition was the equivalent of a disease or functional disorder. Furthermore, as the Commission noted, none of Habinka's treating physicians were called to testify as to the nature of his physical condition or his drug dependency and whether he suffered from a disease or functional disorder. Taking all the evidence into consideration, in light of the complainant's burden of proof, we cannot say that the Commission's finding, that he failed to establish by a preponderance of the evidence that his opiate/methadone addiction was a legally cognizable physical handicap, was against the manifest weight of the evidence. Accordingly, we must uphold that finding.

■■■ Complainant nonetheless contends that the Commission's decision is based upon an unsupported legal conclusion that he could establish an actual handicap of drug dependency in only one way, namely, by the in-person testimony of a treating physician. He specifically cites the case of *In re Coleman* (1983), 10 Ill. HRC Rep. 2, in which the Commission recognized Coleman's alcoholism as an actual handicap under the Act. In *Coleman*, the ALJ found that the complainant had not demonstrated that her "addiction to alcoholic beverages to an excess" was a handicap within the statutory definition because she presented "no expert testimony or other evidence" that her condition resulted from a disease, injury, congenital condition of birth or functional disorder. (*Coleman*, 10 Ill. HRC Rep. at 12.) The Commission, in affirming the ALJ's finding in favor of Illinois Bell on other grounds, stated in *dicta*, "We think complainant established that her condition did arise from or was the equivalent of a disease." (*Coleman*, 10 Ill. HRC Rep. at 4.) Unlike the Commission in that case, we do not have before us the record of testimony and other evidence presented at the *Coleman* hearing. From the ALJ's findings of fact, we can only glean that Coleman was referred to Illinois Bell's own alcoholic rehabilitation program by a physician employee of Illinois Bell, and had a discussion with a counselor there. She was also absent on paid "sickness disability" at the time of these events. While it ap-

pears that whatever evidence presented by Coleman satisfied the Commission as to her burden of proving that she suffered from the disease of alcoholism, even though that evidence did not include testimony of her treating physician as to the nature of her condition, it does not follow that the Commission must also recognize Habinka's drug dependency as the equivalent of a disease or functional disorder without benefit of such testimony. As the Commission stated in the more recent case of *Jackson and the County of Cook* (1986), 24 Ill. HRC Rep. 33, 36:

> "In the Commission's rules on handicap discrimination in employment, a clear distinction is made between 'alcohol abuse' and diseases such as 'alcoholism'. *** [A]lcohol abuse, in and of itself, is not a handicap. It only becomes a handicap if the Complainant can demonstrate that the condition arises from or constitutes the equivalent of a disease or functional disorder."

Furthermore, each case must be judged independently under its own set of facts. See, *e.g., In re Sarna* (1984), 13 Ill. HRC Rep. 171 (complainant who testified as to her stay in a psychiatric hospital and the drugs administered to her there had not shown direct, competent evidence of a mental handicap where she did not produce treating physicians to testify and to submit to cross-examination by respondent). The Commission's decision in the instant case states that apparently, the panel in *Coleman* was "willing to take official notice that alcoholism is a disease." It concludes, however, that Habinka has not established by a preponderance of the evidence that he suffers from a disease which is the equivalent of alcoholism. As stated above, because we cannot say this conclusion is against the manifest weight of the evidence, it must be upheld.

 In addition to prior Commission decisions recognizing alcoholism as a handicap under the Act, the complainant also calls our attention to other jurisdictions which have recognized drug dependency as a handicap under analogous employment discrimination statutes. We note, however, that in the statutes cited, the express definition of "handicap" is significantly different from that of the Act. Additionally, in the case of analogous Federal legislation, the accompanying regulations specifically recognize drug addiction as a handicap, based upon advisory opinions of Cabinet level officials and the relevant legislative history, and these regulations have shaped judicial decisions interpreting the scope of the statutes. Finally, it is clear that irrespective of any similarities or differences, decisions interpreting these statutes are not controlling here. It has been recognized that while Federal court opinions which interpret analogous Federal antidis-

crimination statutes are both helpful and relevant, they are not binding in cases brought pursuant to the Illinois antidiscrimination laws. *Montgomery Ward & Co. v. Fair Employment Practices Comm'n* (1977), 49 Ill. App. 3d 796, 805, 365 N.E.2d 535, 541; *City of Cairo v. Fair Employment Practices Comm'n* (1974), 21 Ill. App. 3d 358, 363, 315 N.E.2d 344, 348.

Complainant cites, for example, *Hazlett v. Martin Chevrolet, Inc.* (1986), 25 Ohio St. 3d 279, 496 N.E.2d 478, in which the Ohio Supreme Court held that a "handicap," for purposes of that State's employment discrimination statute, included alcoholism and drug addiction. The Ohio law provided, in pertinent part:

> " ' "Handicap" means a *medically diagnosable, abnormal condition* which is expected to *continue for a considerable length of time,* whether correctable or uncorrectable by good medical practice, *which can reasonably be expected to limit the person's functional ability* \*\*\* so that he can not perform his everyday routine living and working without significantly increased hardship and vulnerability to what are considered the everyday obstacles and hazards encountered by the nonhandicapped.' " (Emphasis added.) (*Hazlett,* 25 Ohio St. 3d at 280, 496 N.E.2d at 479, quoting R.C. 4112.01(A)(13).)

Following a hearing, the Ohio Civil Rights Commission found that Martin Chevrolet had discriminated against its employee, an alcoholic and user of cocaine and other drugs, by summarily terminating him when he requested a 28-day leave of absence to enter a residential treatment facility recommended by his physician. In affirming the Commission's decision, the court observed that evidence at the hearing included the unrebutted testimony of a physician that "drug addiction creates in its victims a debilitating chemical imbalance that is an abnormal physical condition." The expert also presented unrebutted testimony that "such condition limits the user's functional ability, including physical endurance, mental capacity, and judgment," and that "the effects of the drug may remain for a considerable period of time." Based on this unrebutted expert testimony by the complainant's treating physician, which was entirely consistent with the express statutory definition of "handicap" as a medically diagnosable, continuing, abnormal condition which limited functional ability, the court concluded that alcohol and/or drug addiction fell within the ambit of the Ohio statute. (*Hazlett,* 25 Ohio St. 3d at 280, 496 N.E.2d at 479.) Both in terms of the statutory definition of "handicap" at issue, and the nature and weight of the evidence presented regarding the complainant's condition in light of that definition, *Hazlett* is clearly

distinguishable from the case at bar.

Complainant also seeks to rely on the fact that drug addiction is recognized as a handicap for purposes of the Federal Rehabilitation Act of 1973 (29 U.S.C. §701 *et seq.*) (1982) (Rehabilitation Act). (See, *e.g., Wallace v. Veterans Administration* (D. Kan. 1988), 683 F. Supp. 758 (registered nurse, an admitted recovering drug addict free from drug abuse for over nine months, was discriminated against by a Veterans Administration hospital which refused to hire her, on the basis of her physical handicap, in violation of Rehabilitation Act); *Burka v. New York City Transit Authority* (S.D. N.Y. 1988), 680 F. Supp. 590 (Rehabilitation Act, while not protecting as "handicapped" illegal drug abusers who merely tested positive in preemployment drug-screening procedures, protects drug abusers otherwise qualified for a job who have been or who are being rehabilitated, including those with a past addiction currently treated by methadone maintenance); *Davis v. Bucher* (E.D. Pa. 1978), 451 F. Supp. 791 (former narcotics addict, enrolled in methadone program and testing negative for all other drugs, is "handicapped individual" under Rehabilitation Act and cannot be excluded from employment solely because of prior history of drug abuse).) Section 504 of the Rehabilitation Act, as amended, 29 U.S.C. section 794 (1982), prohibits the exclusion "solely by reason of their handicap" of "otherwise qualified handicapped individuals" from government agencies or recipients of Federal funds. The Rehabilitation Act defines a handicapped individual as "any [individual] who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." (29 U.S.C. §706(7)(B) (1982).) As the *Bucher* court noted, not only is it "undisputed" that drug addiction substantially affects an addict's ability to perform major life activities, but the Department of Health, Education and Welfare regulations supplementing the Rehabilitation Act, and the Department's analysis accompanying those regulations, had also, prior to the court's decision in 1978, addressed and disposed of the issue of whether drug addiction was a handicap as defined by the statute. That analysis stated in part:

" 'The Secretary [of Health, Education and Welfare] has carefully examined the issue and has obtained a legal opinion from the Attorney General. That opinion concludes that drug addiction and alcoholism are "physical or mental impairments" within the meaning of \*\*\* the Rehabilitation Act \*\*\*, and that drug addicts and alcoholics are therefore handicapped for purposes of section 504 if their impairment substantially limits one

of their major life activities. \*\*\* In addition, while Congress did not focus specifically on the problems of drug addiction and alcoholism in enacting section 504, the committees that considered the Rehabilitation Act of 1973 were made aware of the Department's long-standing practice of treating addicts and alcoholics as handicapped individuals eligible for rehabilitation services under the Vocational Rehabilitation Act.' " (42 Fed. Reg. 22686 (May 4, 1977), quoted in *Davis v. Bucher* (E.D. Pa. 1978), 451 F. Supp. 791, 796.)

Current Federal regulations supplementing the Rehabilitation Act contain identical language. (See 45 C.F.R. pt. 84, App. A, at 375 (1988).) However, unlike the situation with the Federal statute, neither the Illinois legislature nor the Human Rights Commission, acting pursuant to statutory authority, has chosen to officially recognize drug dependency as a condition included within the definition of "handicap" as stated in the Human Rights Act. Our task, as a court of review, is not to judge the wisdom thereof, but to determine whether the Commission's application of its own rules to the facts and evidence presented by the parties in this case was clearly erroneous. On the basis of the record before us, we must conclude that it was not.

█ Complainant also contends that the Commission's reading of the statutory requirements for establishing drug or alcohol dependence as a protected handicap violates Illinois public policy, which favors rehabilitation and treatment for controlled substance addicts. (See, *e.g.*, the Illinois Alcoholism and Substance Abuse Act, Ill. Rev. Stat. 1987, ch. 111½, par. 6301 *et seq*.) He maintains that the Commission's requirements as stated in *Jackson and the County of Cook* and in this case will discourage individuals in need of treatment from coming forward because of uncertainty about job loss and about qualifying as handicapped individuals under the Act. He further contends that an interpretation of the Act which "repudiates" the concept that opiate dependence is a disease-equivalent would leave employers free to terminate employees "solely" because they are found to be enrolled in methadone treatment programs. We hasten to point out that neither the Commission's finding as to "actual handicap" in this case, nor our decision to uphold that finding on appeal, "repudiates" the concept that opiate dependence may constitute a disease equivalent. Nothing herein precludes a finding in other cases that a complainant has met his burden of establishing that his drug dependency, including but not limited to opiate/methadone dependency, arises from or constitutes the equivalent of a disease or functional disorder and thereby qualifies as a handicap under the Act. In fact, in determining that

"complainant's condition" was not proved to be a qualifying condition by a preponderance of the evidence, the Commission never addressed the more general question of whether heroin/methadone addiction, or any drug dependency, "can qualify" as a handicap. We note that the Commission did not reverse the ALJ's recommended order and decision, or dismiss Habinka's complaint, on grounds that the ALJ's legal conclusion, that "heroin/methadone addiction can qualify as a 'handicap' under [the] Act" was erroneous.

We further observe that nowhere in the Act or the rules is language which would preclude a complainant from establishing his condition of drug dependency as a cognizable handicap. To the contrary, the agency's inclusion of the language, "the conditions of obesity and drug or alcohol abuse shall not be deemed 'handicap' *unless* the person can demonstrate that the condition arises from or constitutes the equivalent of a disease or functional disorder. (*Even where drug dependence is established as constituting a disease or functional disorder*, see paragraph (d) ***),'' in the interpretive rules clearly contemplates the possibility of a complainant's establishing his drug addiction as a qualifying condition. (Emphasis added.) (56 Ill. Adm. Code §2500.20(c) (1985).) However, by their express terms, the rules also prescribe that drug and/or alcohol abuse which (1) is not shown by a preponderance of the evidence to arise from or constitute the equivalent of a disease or functional disorder, or (2) affects the ability of the substance abuser to perform the job in question, will not be protected under the Act. By its application of the interpretive rules to the particular facts of this case, we do not believe that the Commission has in any way restricted or undermined the potential scope of handicap discrimination protection for drug-dependent persons under the Illinois statute. It has merely found that complainant, based on the evidence presented, did not meet his burden of proof as required to establish that he suffered from a qualifying condition.

We next address the Commission's conclusion that, contrary to the ALJ's finding, complainant was not the victim of discrimination based upon a "perceived" handicap. The ALJ had determined that "even if [c]omplainant somehow failed to make a showing that his heroin/methadone addiction should be categorized as a handicap, there is possibly no greater example of a perceived handicap than the instant case." The Commission's interpretive rules specify that one who is perceived by his employer to be handicapped is entitled to the Act's protection even if he or she is not in fact handicapped, but is erroneously perceived as being afflicted with a handicapping condition. (56 Ill. Adm. Code §2500.30(b) (1985).) The ALJ reasoned that Lake River

perceived Habinka's methadone addiction to be a handicap because almost as soon as it learned of his methadone treatment, it made his discontinuance of that treatment a condition of keeping his job and rejected any compromise short of total detoxification. He found that Johnson and Foster took this stand based either upon their negative reaction to complainant's methadone use *per se*, or upon the erroneous notion that methadone use caused his absences. The Commission totally rejected these findings. It concluded that its previous cases stood for the proposition that a person will be protected if that person is perceived by his employer to have a condition which *would be a handicap* under the Human Rights Act. For example, if an employer erroneously believes a minor disease is a substantial, long-term illness, or a currently cured disease still continues, that perception of a handicapping condition cannot be a legitimate basis for terminating an employee. The Commission further observed that based on the information given to Lake River representatives prior to July 13, 1982, it was reasonable for them to conclude that the complainant was taking methadone because he lacked the "commitment and motivation" to detoxify, and not because he suffered from a disease or its equivalent. According to the Commission, there was no evidence that the ultimatum given to Habinka was based upon a perception by company officials that his taking of methadone was a handicapping condition, *i.e.*, one caused by or constituting the equivalent of a disease.

■■ While it is evident from the record that Lake River representatives must have perceived that complainant had a drug problem which required either continued methadone treatment, detoxification, or some other accepted treatment regimen, we cannot say that the Commission's conclusion, that respondent did not perceive its employee to have a condition which would qualify as a handicap under the Act, was against the manifest weight of the evidence. Nor is the Commission's finding inconsistent with its construction and application of its rules on perceived handicap discrimination in other cases. (See, *e.g.*, *Kenall Manufacturing Co. v. Human Rights Comm'n* (1987), 152 Ill. App. 3d 695, 504 N.E.2d 805 (Commission's finding of handicap discrimination by employer upheld where complainant had history of heart disease and was perceived as being handicapped, although fit for his job and released by physician to return to work after a heart attack); *In re Chenoweth* (1983), 10 Ill. HRC Rep. 336 (dismissal of case vacated by Commission where complainant alleged that employer had erroneously perceived him to have a long-term mental disease because of a suicide attempt); *In re Plott* (1982), 7 Ill. HRC Rep. 70 (city, which perceived fired employee as being handicapped because of

an arthritic condition which did not actually affect his ability to perform his job, discriminated against him in violation of the Act); *In re L'Hote* (1982), 4 Ill. HRC Rep. 51 (railroad discriminated against complainant by refusing to hire him when it perceived him to be handicapped because he formerly had been a victim of Hodgkin's disease).) The Commission has substantial discretion in applying its rules, and its conclusions as to perceived handicap discrimination in this case are neither plainly erroneous nor inconsistent with long-settled constructions. Therefore, we must affirm the Commission's finding that complainant did not establish the existence of a "perceived handicap" in the instant case.

Moreover, even if the ALJ's findings were correct as to the perception of Lake River's managers that complainant suffered from a handicap, this court would be compelled by our decision in *Village of Oak Lawn v. Human Rights Comm'n* (1985), 133 Ill. App. 3d 221, 478 N.E.2d 1115, to affirm the Commission's conclusion. In *Village of Oak Lawn*, the complainant charged the village with handicap discrimination in their refusal to hire her for the position of police officer. While the matter was pending before the Commission, the village brought to the panel's attention newly discovered evidence that complainant had made misrepresentations regarding her medical history and marital status on her application for employment, and then moved for a summary dismissal. The Commission denied the motion and affirmed the ALJ's finding of discrimination, ordering the village to hire the complainant and to pay her lost wages. It stated that because the village did not learn of the applicant's misrepresentations until after they had refused her employment and she had filed her discrimination charge, they could not be permitted to use information, of which they had no knowledge at the time of their actions, as the basis for their asserted "nondiscriminatory reason" for initially refusing to hire her. On appeal, we held that even though the village was unaware of the misrepresentations at the time they were made, the complainant could not use her concealment of certain facts as a shield against the village's attempt to rebut an unlawful discrimination charge. *Village of Oak Lawn*, 133 Ill. App. 3d at 225, 478 N.E.2d at 1118.

Similarly, in the case now before us, Habinka cannot be permitted to prevail on a perceived handicap claim by establishing that Lake River's representatives "perceived" him to be handicapped by his methadone addiction which, in itself, did not affect his ability to perform his job. If Johnson, Foster, and other Lake River officials did perceive "methadone" to be his problem, and erroneously believed that he must eliminate methadone treatment from his life in order to

perform acceptably in his supervisory position, it was clearly because, based on the information they received about his condition and absent other information withheld from them, they virtually could not have perceived anything else. Complainant's doctors were instructed by him not to disclose his methadone treatment when they eliminated his seizure and headache medications as possible causes of his absenteeism and behavioral changes. When pressed to inform his supervisor as to any other possible cause of this behavior, he indicated that he was taking methadone, but did not disclose his other drug use, including frequent ingestion of Valium and a variety of other street drugs. At the Hines conferences with complainant's physicians and counselor, respondent's managers were given much information about methadone and some information about detoxification, but complainant's other drug abuse was not discussed in relation to his treatment, his absences, or otherwise. Thus, whatever Lake River "perceived" as being complainant's problem was largely the result of his own concealment of the larger multiple substance abuse problem which he faced and which may have impinged upon job-related activities. Therefore, in light of our decision in *Village of Oak Lawn,* as well as our conclusion that the Commission's findings on "perceived handicap" discrimination were not against the manifest weight of the evidence or plainly erroneous, we are compelled to uphold those findings.

▪▪▪ Having affirmed the Commission's findings that complainant failed to establish that his condition constituted either an actual or a perceived handicap, we conclude that he has failed to establish a *prima facie* case of handicap discrimination under the Act. While our analysis need not extend beyond these considerations in order to reach this conclusion, we will accept respondent's invitation to address the second requirement of a *prima facie* case, namely, that the handicap must be unrelated to the employee's ability to perform the job in question. Based on a careful review of the testimony and medical records in evidence, it is apparent to this court that complainant, even if he had established his condition to be a handicap as defined by the Act, did not prove by a preponderance of the evidence that his stated condition of opiate dependency, during the period between November 1981 and July 1982, was unrelated to his ability to perform the job requirements of a warehouse supervisor at Lake River.

The unrebutted testimony of Lake River's managers was that complainant's excessive absenteeism detrimentally affected both worker morale and supervisory scheduling and productivity at the company. It is also clear from their testimony that the stable attendance necessary to maintain supervisory credibility and to ensure con-

tinuous coverage by supervisory staff in complainant's area of responsibility was a requirement of his job. While the evidence does not link Habinka's headache or seizure medication, or his medically prescribed methadone, to his absences or behavioral changes on the job, the same cannot be said for his general condition of "opiate dependency," which included but was not limited to methadone addiction. By his own admission and as corroborated by the Hines records, complainant was taking, during the relevant period, a volatile combination of drugs, in significant amounts, the majority of which were opiate-based. These included heroin and Darvon, a drug which, according to Dr. Sabelli, had such a chemical similarity to methadone that it produced the same basic effect in the brain. Dr. Sabelli further testified that someone who took heroin and Darvon, in addition to methadone, was essentially increasing the dose of any one of these drugs. It was his medical opinion that high dosages of opiates can not only cause seizures, but also, especially in combination with Valium and other drugs, are likely to impair a person's ability to work and his attendance, causing decreasing motivation and periods of sedation. Although Lake River never prevented him from reporting to Hines for methadone at the required times, and the medical records do not indicate that he failed to do so, complainant told Mr. Johnson that he sometimes missed methadone pick-ups and took "something else." In light of this evidence, it is clear that complainant has not shown that his condition of opiate dependency was unrelated to his ability to perform his job, a prerequisite for establishing a *prima facie* case of handicap discrimination.

For all of the above reasons, we cannot find that the Commission's decision was against the manifest weight of the evidence. Accordingly, the order and decision of the Commission are affirmed.

Affirmed.

LORENZ and PINCHAM,* JJ., concur.

---

*Justice Pincham participated in the decision prior to his resignation.